IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| BUSINESS AIRCRAFT LEASING, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| BRIAN CARN MINISTRIES, INC.; | ) | CIVIL ACTION NO. |
| MIRACLE ARENA FOR ALL NATIONS; | ) | 3:16-cv-01577 BRIAN |
| CARN; MARTIN KOFI DANSO; | ) | |
| RONALD E. MAYS; CITY JET, INC. | ) | |
| MICHAEL CARASTRO; and | ) | |
| APOLLO FLIGHT TRAINING & | ) | |
| AIRCRAFT MANAGEMENT, LLC | ) | |
| d/b/a APOLLO AVIATION, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED DECLARATION OF MARTIN KOFI DANSO IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

I, Martin Kofi Danso, hereby declare and state the following in support of the Motion to Dismiss Amended Complaint:

1.

My name is Martin Kofi Danso. I am over the age of 21 years and I am competent to give this declaration. My home address is 97 Cachet Hill Crescent, Woodbridge, ON L4H 1S6 and I am a citizen of Canada. I am giving this declaration for in support of the Motion to Dismiss Amended Complaint on behalf of myself and on behalf of Miracle Arena, specifically to address the allegations of the Amended Complaint as they relate to Miracle Arena, and for all other purposes

1

authorized by law.

1.

Miracle Arena for All Nations ("Miracle Arena") is a Canadian not-for-profit corporation, with its principal place of business at 20 Milvan Dr, North York, ON M9L.  I am the Senior Pastor for and founder of Miracle Arena.

2.

Miracle Arena has always been a Canadian not-for-profit corporation, and has never been authorized to do business in Tennessee and does not do business in Tennessee.

4.

Miracle Arena does not own any property in the State of Tennessee.

5.

Miracle Arena has not conducted business in the state of Tennessee, and has no contacts with the State of Tennessee..  Since Miracle Arena is not a U.S. company, any contacts with the State of Tennessee would be infrequent at most and not systematic or continuous.

2

6.

I have reviewed the allegations of the Complaint and the exhibits attached thereto.  Miracle Arena is not a party to the September 4, 2016 Lease Agreement with the Plaintiff.  Although Miracle Arena proposed entering into a lease purchase agreement for the aircraft that is the subject of the Complaint, Plaintiff did not accept this proposal.  A true and accurate copy of a draft of this proposal is attached hereto as Exhibit A and has been referred to in the Memorandum in Support of the Motion to Dismiss Amended Complaint as the Proposed January 2016 Miracle Arena Lease Agreement.

7.

Miracle Arena is not a party to any of the agreements attached to or referenced in the Complaint.

8.

Neither Miracle Arena nor I have consented to jurisdiction in the State of Tennessee in this matter.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, this 9th of September, 2016.

_____
MARTIN KOFI DANSO

# EXHIBIT A

AIRCRAFT LEASE AGREEMENT

THIS AIRCRAFT LEASE AGREEMENT (the "Agreement") is made this ___ day of January 2015 between MIRACLE ARENA, a Canadian corporation whose address is 97 Cachet HillCrest, Woodbridge, ON L4H 156 the "Lessee") and BUSINESS AIRCRAFT LEASING, INC., a Tennessee corporation whose address is 404 BNA Drive, Suite 305, Nashville, TN 37027 (the "Lessor").

A.     Lessor is the owner of the following Aircraft (the "Aircraft"):

Manufacturer:  British Aerospace
Model:  HA-125-800A
Serial Number:  NA-0401 (258100)
Registration Number:  N180NE
Engine Make and Model:  Garrett TFE731-5R-1H
Engine Serial Number:  P-91311 and P-91312
APU Make and Model:  Sundstrand T61-40C8D-1
APU Serial Number:  K00027

Together with all attachments, accessories, appliances, alterations, additions, substitutions, instruments, avionics and other miscellaneous equipment as more specifically set forth in Schedule A, attached hereto and incorporated herein by this reference, all of which are included in the term "Aircraft", set forth in this Agreement.

B.     Lessee desires to lease the Aircraft from Lessor, and Lessor is willing to lease the Aircraft to Lessee, for the term and purposes, and on the terms and conditions, set forth in this Agreement.

NOW THEREFORE, Lessor and Lessee agree as follows:

1.     Use of Aircraft.  Lessor hereby grants to Lessee the right to use the Aircraft on the terms and conditions set forth in this Agreement.

2.     Term.  The term of this Agreement shall commence on January 15, 2016 and shall continue until January 31, 2018 (the "Lease Term").

3.     Payments to Lessor.

(A)     Lessee shall pay Lessor prior to the commencement date stated in Section 2 above an initial rent payment in the amount of One Hundred Fifty Thousand U.S. Dollars ($150,000.00) ("Deposit/Initial Rent Payment").  Rent payments for subsequent months shall be Five Thousand U.S. Dollars ($5,000.00) (the "Rent") without demand, offset, deduction or counterclaim on or before the first day of each month.  Notwithstanding the foregoing, if the commencement date is not on the first day of the month, then the second month's Rent payment shall be prorated. (Difference to be supplanted) The Rent payment entitles Lessee to no more than thirty (30) hours per month.  For every hour flown over the thirty hours per month, Lessee will reimburse Lessor an additional Five Hundred U.S. Dollars ($500.00) ("Excess Utilization Charges").  Said Excess Utilization Charges are payable within ten (10) days after the end of each month. *Lessee shall have the right to purchase the aircraft at end of the term for an approximate amount of $177,000.00.*

(B)    In addition to the Rent, Lessee shall pay Lessor engine reserve hourly charges ("Engine Reserves") at the current hourly rate charged by Honeywell MSP engine maintenance for contract number 6273F.   Lessee is subject to the escalation terms, annual minimum hourly requirements and all other terms and conditions of the MSP contract during the Lease Term.   Non-compliance with the terms of the Honeywell MSP engine maintenance program will be considered an Event of Default under this Lease.   A copy of the Honeywell MSP contract will be provided to Lessee prior to execution of this Lease Agreement.

(C)    Any moneys owed to Lessor by Lessee, including, but not limited to Rent, Excess Utilization Charges and Engine Reserves not be received for any reason within ten (10) days after the date in which such moneys became due, Lessee shall pay to Lessor a late fee on such moneys at Five Hundred U.S. Dollars ($500.00) per day.   Such late fee shall accrue from the date moneys were first due.

(D)    Within ten (10) days after the end of each month, Lessee shall provide to Lessor a statement of the previous month's flight hours together with a check in the amount due at the rate described in Section 3(B) above.

(E)    If, at the expiration of the term of this Lease Agreement, all amounts due under this Lease Agreement have been paid by Lessee to Lessor, and Lessee is not in default in the observance or performance of any of its obligations under this Lease Agreement, then Lessor shall pay, within thirty (30) days, to Lessee Seventy Five Thousand U.S. Dollars ($75,000.00).   If Lessee is then in such default, then Lessor may deduct a reasonable and necessary amount to cure any such default, and Lessor shall then pay the balance, if any, to Lessee within thirty (30) days after the date of determination of the amount necessary to cure any default.

(F)    Lessor reserves the right to increase, but not decrease, the Rent during the term of this Agreement and all extensions if the United States Federal Reserve Bank increases the Prime Interest Rate ("Prime").   As of execution of this Agreement, Prime is 3.25%. If Prime increases one hundred (100) basis points to 4.25%, the Rent shall increase by One Thousand Eight Hundred U.S. Dollars ($1,800.00) when the Rent payment is due.   For every twenty five (25) basis points therafter, the Rent is increased by Five Hundred Twenty U.S. Dollars ($520.00).   Such Rent increase shall remain in effect until this Agreement is terminated or until Prime is increased again.

4.    Delivery and Acceptance. The Aircraft shall not be leased by Lessor to the Lessee and the Lessee shall have no right to possession of the Aircraft until the following conditions precedent have been fulfilled:

(A)    Lessor has received evidence of the insurance coverage required under Section 11 hereof.

(B)    Lessee has accepted delivery of the Aircraft and duly executed the Delivery and Acceptance Certificate attached hereto as Exhibit I and incorporated herein by reference for all purposes.

(C)    The Initial Rent Payment has been received pursuant to Section 3(A) above.

(D)     Lessee specifically states that it is knowledgeable and experienced in aircraft flight operations and that it does not rely upon any expertise of the Lessor in regard to the condition or acceptance of the Aircraft.

(E)     Lesssee ("Guarantor") has executed a Personal Guaranty attached hereto as Exhibit IV and incorporated herein by reference for all purposes.

(F)     Lessee shall have provided a corporate board resolution authorizing the execution of this Lease Agreement.  Lessee shall also have provided a statement of good standing from the Secretary of State of its formation.

(G)     Lessee waives any right to a visual inspection of the Aircraft before signing this Agreement.

(H)     In October, 2015, the Aircraft is due an A-G Inspection.  Lessor agrees to pay the flat rate inspection cost and for discrepancies required for the maintenance facility to sign off the A-G Inspection in the Aircraft logbooks.  The maintenance facility performing the A-G Inspection is The Aircraft Maintenance Company, Inc. located in Bessemer, Alabama.  Lessee is obligated to pay Rent while the Aircraft is undergoing the A-G Inspection.

5.     <u>Aircraft Operation</u>.

(A)     During the Lease Term, Lessee shall have exclusive Operational Control of the Aircraft as defined pursuant to 14 Code of Federal Regulations Part 1.1, "with respect to a flight, [operational control] means the exercise of authority over initiating, conducting or terminating a flight" ("Operational Control").  The equivalent regulation or rule in any other applicable jurisdiction will also be understood to constitute Operational Control.

(B)     During the Lease Term hereof and any extensions thereafter, Lessee agrees the Aircraft and the engines shall be operated in accordance with Lessor requirements, the Aircraft Flight Manual, Pilot's Operating Handbook, the applicable Engine Maintenance Manual, other instructions issued by the Equipment Manufacturer and the operation of the Aircraft and the engines shall comply with the requirements of Federal Aviation Administration ("FAA").

(C)     Lessee shall, at its sole expense, provide all crewmembers required for operation of the Aircraft during the term of this Agreement.  All crewmembers must be school trained and qualified to Lessee's insurance company's standards to fly the Aircraft.  Cost of pilot school training shall be at Lessee's expense.

(D)     Lessee shall pay all expenses in preparation and connection for any flight, including but not limited to, expenses for fuel, crew quarters, landing fees, imposts, duties, fines, meals, all other out-of pocket crew expenses and the cost of any special equipment required for Lessee's operation of the Aircraft.

(E)     Lessee will not use the Aircraft to haul freight of any kind or utilize the Aircraft for air ambulance or charter use.

(F)     Lessee, at its expense, shall keep the Aircraft hangared at all times at its principal place of operations in Montgomery, Alabama or any other base of operation. Proper care will be taken to ensure safety of the aircraft when it is away from its principal place of

operations and hangared at all times if inclement weather if forecasted. Anytime the Aircraft is not being used, Lessee agrees to keep engine covers and pitot covers, etc. installed at all times on the Aircraft. In addition, gust locks shall be installed whenever the Aircraft is parked outside.

(G) Aircraft will not be used for training purposes, other than initial and recurrent pilot checkout.

(H) No smoking is allowed on the Aircraft.

(I) Lessee agrees to keep the Aircraft clean inside and out during the term of this Agreement and agrees to wax the exterior of the Aircraft once per quarter.

(J) If Lessee desires to have the registration number blocked, Lessor is agreeable provided it is at Lessee's expense and Lessor shall not be denied the ability to track the Aircraft.

6. <u>Diminution of Value</u>. Lessee shall promptly notify Lessor in the event the Aircraft shall have suffered any major damage or loss of a type required to be reported to the FAA, or recorded in the Aircraft Log Books for the Aircraft under FAA regulations governing the use of the Aircraft or loss of any Aircraft Log Books (hereinafter referred to as "Diminution of Value"). Thereafter, Lessor shall select a qualified and certified aircraft appraiser to render opinion based upon a description of the Aircraft (i) assuming no Diminution of Value and (ii) upon a description of the Aircraft including the Diminution of Value for the Aircraft. The difference between the value of the Aircraft assuming no Diminution of Value and the value of the Aircraft including the actual Diminution of Value, together with interest thereon for the period between the date payment is due as described below until the date of payment at a rate equal to one and one-half percent per month, shall be paid by Lessee to Lessor in the form of a lump sum payment immediately upon the later to occur of (i) settlement and payment by the insurance carrier for Diminution of Value insurance (if Lessee carries such insurance), or (ii) thirty (30) days after Lessor notifies Lessee of the opinion rendered by the aircraft appraiser. In addition, Lessee shall pay all fees, costs, and other expenses incurred due to and/or associated with the determination of the Aircraft's amount of loss in value in the event of Diminution of Value. If Diminution of Value occurs, as defined in this Section 6, Lessee agrees to pay Rent per Section 3(A) under all circumstances until the Aircraft is returned to the Lessor in a flyable condition or until Lessor is reimbursed in full by Lessee's insurance company. Lessee, at its expense, may carry Diminution of Value Insurance with coverage amounts mutually agreeable to Lessee and Lessor.

7. <u>Lessor's Inspection</u>. Lessor or its authorized representatives may inspect the Aircraft and make copies thereof of the Aircraft records at any reasonable time. Lessee may show the Aircraft to future lease prospects at any reasonable time during the last twelve months of the Lease.

8. <u>Lessee Modifications to the Aircraft</u>. Lessee, at its sole expense, may make alterations, modifications, additions or improvements to the Aircraft, provided that:

(A) any such alteration, modification, addition or improvement has been approved by the Manufacturer of the Aircraft and/or required by the FAA;

        (B)    any such alteration, modification, addition or improvement does not eliminate any of the Aircraft's capabilities, nor reduce its value or utility, nor impair its warranty, airworthiness, certifications, safety or performance; and

        (C)    Lessee receives Lessor's prior written approval.

Unless otherwise agreed in writing, all such alterations, modifications, additions and improvements to the Aircraft shall become a part of the Aircraft and the property of Lessor.

Lessee shall promptly notify Lessor in writing of the nature of any contemplated alteration, modification, addition or improvement, and if Lessor's written approval is given, Lessee shall subsequently notify Lessor upon the completion of the alteration, modification, addition or improvement that such work has been accomplished and all required entries in the Log Books and records of the Aircraft have been made and certified by duly qualified FAA licensed personnel.

    9.    <u>Maintenance and Repairs</u>.

        (A)    Lessee represents that at Delivery, the Aircraft is in good operating condition with all airworthiness-related systems functional and operational as acknowledged and evidenced by Lessee's execution of the Delivery and Acceptance Certificate in the form of Exhibit I attached hereto.

        (B)    During the term of this Agreement and until such time as the Aircraft is returned to Lessor, Lessee agrees, at its own cost and expense, to keep the Aircraft at all times in fully operational, duly certified, in airworthy condition and maintained in accordance with the Aircraft manufacturer's recommended inspection program and condition adequate to comply with all regulations of the FAA or any other governmental agency having jurisdiction over the maintenance, use or operation of the Aircraft. Without limiting the foregoing, Lessee, at its own cost and expense, shall:

        (i)    maintain, inspect, service and test the Aircraft and perform all repairs on the Aircraft in accordance with all maintenance manuals for the Aircraft from time to time issued by the Aircraft manufacturer and vendors;

        (ii)    comply with all applicable recommended and mandatory Service Bulletins issued by the Aircraft manufacturer;

        (iii)    comply with all Airworthiness Alerts and Airworthiness Directives issued by the FAA, or any other governmental agency having jurisdiction over the Aircraft; and

        (iv)    keep the Aircraft clean, waxed and detailed on a regular basis; and

        (v)    keep the Aircraft enrolled on the CAMP computerized maintenance tracking program. Lessee will update CAMP with all scheduled/unscheduled maintenance and servicing of the Aircraft. Lessee shall pay Lessor a pro-ration on the first year of the CAMP subscription. The cost of future years of Camp subscriptions shall be at Lessee's expense. Further Lessor shall be given full rights to access CAMP.

(C)     All work required by this Section 9 shall be undertaken and completed only by a Hawker Service Center or a service facility acceptable and approved in writing by Lessor.  All replacement parts shall be of the type approved by the Aircraft manufacturer, being properly certified and tagged, of the same quality as the replaced part, and become the property of Lessor free and clear of all liens, charges and encumbrances upon installation.    Minor maintenance  and servicing, as defined as any maintenance interval less than twelve (12) months of the Aircraft may be performed by Lessee's Aircraft management company if Lessee's employees are trained and qualified or other maintenance facility approved by Lessor.    If Lessee desires that a non-Hawker Service Center perform any maintenance on the Aircraft, minor or otherwise, Lessee and Lessor shall coordinate such maintenance work scope in advance.  Lessee will keep a list and provide a copy to Lessor of all work order and invoices for maintenance performed on the Aircraft.

(D)     Lessee shall operate the Aircraft and engines according to the manufacturer's operator handbook, flight manual and MSP contract.  In the event any negligent overtemping or exceedences of tolerances are detected, the cost of any parts/components requiring replacement, including the cost of labor to replace any parts/components as a result of overtemping or exceedence of tolerances shall be paid for by Lessee.

(E)     Lessee agrees to perform a desalinization compressor wash to the Aircraft engines as prescribed in the Hawker Maintenance Manual or at a minimum of every six months and record of the compressor wash shall be placed in the Aircraft logbooks.

(F)     Lessee agrees to provide Lessor with copies of all maintenance and flight logbook entries on a six-month basis.

10.    Loss or Damage.

(A)     Risk of Loss.  During the term of this Agreement and until such time as the Aircraft is returned to Lessor, Lessee hereby assumes and bears the entire risk of loss, theft, confiscation, damage to or destruction of the Aircraft from any cause whatsoever, and shall promptly notify Lessor thereof.  Except as otherwise provided in Section 11 below, this Lease shall not terminate and the obligations, including Lessee's payment of Rent shall not be affected by reason of any damage to or loss of the Aircraft.

(B)     Casualty Occurrence.  In the event of a Total Loss Casualty Occurrence, Lessee shall be obligated to pay Lessor the amount of the all-risk aircraft hull and engine insurance referred to in Section 11 below (hereinafter referred to as the "Stipulated Loss Value").

Upon payment in full of the Stipulated Loss Value, the Aggregate Rentals for the Aircraft shall cease to accrue as of the date of such payment, the Lease shall terminate, and (except in the case of the loss, theft, confiscation or complete destruction of the Aircraft and subject to the rights of the insurer following payment of the settlement to request transfer of title and possession of the Aircraft) Lessee shall be entitled to recover possession of the Aircraft and obtain title thereto.

As used herein, a "Total Loss Casualty Occurrence" shall mean any of the following events with respect to the Aircraft:

(i)     loss of the Aircraft or the use thereof due to the destruction, damage beyond repair or rendition of the Aircraft permanently unfit for normal use for any reason whatsoever;

(ii)     any damage to the Aircraft that results in an insurance settlement with respect to the Aircraft on the basis of a total loss;

(iii)     the theft, secretion, conversion or disappearance of the Aircraft which shall have resulted in the loss of possession of the Aircraft by Lessee for a period of thirty (30) consecutive days or more (or for a shorter period ending on the date on which there is an insurance settlement for a total loss on the basis of the theft or disappearance of the Aircraft);

(iv)     the condemnation, confiscation, seizure of, or the requisition of title to or use or possession of, the Aircraft for a period of thirty (30) consecutive days or more;

(v)     the operation or location of the Aircraft, while under condemnation, confiscation, seizure or requisition, in any area excluded from coverage by any insurance policy in effect with respect to the Aircraft required by the provisions of Section 11 hereof; or

(vi)     any event other than a default where Lessee is obligated to pay to Lessor the Stipulated Loss Value under this Lease.

11.   Insurance.

(A)     Lessee, at its expense, shall secure insurance with an underwriter approved by Lessor and shall maintain in effect throughout the term hereof insurance policies with an insurance carrier having nil deductibles, covering the Aircraft against a Casualty Occurrence and containing such provisions as shall be satisfactory to Lessor in Lessor's sole discretion.   Further, Lessee shall notify Lessor of any additional insureds named on the insurance policy.  Lessee shall not finance such insurance policy premiums by encumbering the Aircraft.  Without limiting the generality of the foregoing, Lessee shall maintain:

(i)     liability insurance covering public liability and property damage including resulting environmental damage in amounts not less than Ten Million U.S. Dollars ($10,000,000.00) for any single occurrence with Lessor and First Tennessee Bank named as additional insureds;

(ii)     all-risk aircraft hull and engine insurance including, without limitation, foreign object damage insurance covering the Aircraft while on the ground, taxiing, and in flight, in an amount equal to $2,000,000;

(iii)     breach of warranty insurance; and

(iv)     confiscation, terrorism and war risk insurance.

(B)     All insurance policies shall name the Lessor as owner of the Aircraft and First Tennessee Bank each as loss payees as stipulated in the insurance certificate furnished herewith, except with respect to insurance under the clause 11(A)(i), such insurance

(i)     shall provide that any cancellation or substantial change in coverage shall not be effective as to any insured for thirty (30) days after receipt by such insured of written notice from such insurer(s) of such cancellation or change and

(ii)     shall contain an endorsement providing for payment by the insurer(s) to Lessor or its affiliates, as the case may be, despite any misrepresentations or breach of warranty by Lessee or any other person.

Such insurance shall not be subject to any offset by any other insurance carried by Lessor, Lessee or any other assured.

(C)     Lessee hereby appoints Lessor as Lessee's attorneys-in-fact to make proof of loss and claim for and to receive payment of and to execute and endorse all documents, checks or drafts on behalf of Lessee in connection with all policies of insurance in respect of the Aircraft other than insurance under clause 11(A)(i).  Such appointment shall be evidenced by Lessee's execution of Exhibit IV in form attached hereto.

(D)     Any reasonable out-of-pocket expense of adjusting or collecting insurance proceeds other than insurance under clause 11(A)(i) shall be borne by Lessee. Lessor may, in its sole discretion, apply proceeds of insurance, in whole or in part, to

(i)     repair or replace the Aircraft or any part thereof or

(ii)     satisfy any obligation of Lessee to Lessor hereunder, except that in the event of a Casualty Occurrence, any insurance proceeds (other than for liability insurance) received by the Lessor with respect to the Aircraft shall be credited against Lessee's obligation to pay the Agreed Insurance Value under Section 10(B) hereof.  Such proceeds shall be used by Lessor to reimburse Lessee if Lessee has already paid such Agreed Insurance Value in full to Lessor.

12.     Return.

(A)     Location. Except as otherwise provided herein, upon the termination or expiration of the Lease, Lessee shall return the Aircraft, in accordance with Section 12(B) below, to a location of Lessor's choosing in the continental United States and execute a Re-delivery and Acceptance Certificate in the form attached hereto as Exhibit III.  All expenses for delivery and return of the Aircraft, including, but not limited to fuel, crew and crew expenses shall be borne by Lessee.  In the event that Lessee fails for any reason whatsoever to return the Aircraft on or before twelve o'clock noon (Central time) on the last day of the Lease, Lessor's damages shall include, but shall not be limited to, an amount equal to One Thousand U.S. Dollars ($1,000.00) for each day that such return is delayed.

(B)     Return Condition. Upon return and at Lessee's sole expense, the Aircraft must satisfy all of the following conditions:

(i)     the Aircraft must be in an airworthy and serviceable condition, with all airworthiness systems functional and operational, meet all of the applicable regulations of the

FAA, have a valid standard FAA Certificate of Airworthiness and be current on the manufacturer's approved maintenance program with no outstanding or deferred items;

(ii) the Aircraft must be in compliance with all modifications, repairs and inspections required by all FAA Airworthiness Alerts, Airworthiness Directives, and recommended and mandatory Service Bulletins issued during the term of the Lease that are required to be performed according to Section 9 hereof. All such modifications, repairs and inspections shall have been performed by a factory service center or a service entity acceptable to Lessor;

(iii) the Lessee acknowledges and agrees that upon return of the Aircraft, Lessor has the option of having the Aircraft inspected and its engines tested and/or inspected by an authorized Hawker Beechcraft factory service center acceptable to both Lessor and Lessee in accordance with accepted practices (the Post-lease Inspection"). Lessor agrees to pay the cost of Post-lease Inspection. Lessee, at its sole cost and expense shall pay for the rectification of all airworthiness discrepancies discovered in the Post-lease Inspection;

(iv) the Aircraft must be returned with all equipment, parts, loose equipment, components, passenger service items and other accessories listed in Schedule A herein that were on or in the Aircraft when delivered to Lessee in a serviceable condition or with an equivalent or better replacement thereof;

(v) the Aircraft must be returned with all records and documents, including logbooks complete and in original form. If originals are not available as referenced in Section 6 above, then any consequences of, or conditions to use of new logs and new maintenance records under FAA rules and regulations shall be observed or complied with, and all entries therein must be complete, correct and current, and in the case of any modifications made to, or supplemental type certificate incorporated in the Aircraft, all engineering documents and drawings thereof must also be returned;

(vi) the Aircraft must be returned in the same condition as received, except for normal wear. For cosmetic purposes, the following shall not be considered normal wear: (a) stains in the interior that cannot be completely removed, (b) chipped wood or laminate, (c) torn seats, carpet, headliner or sidewalls, (d) scratched windshields or windows and (e) dents in the Aircraft fuselage, tail boom or horizontal stabilizer and all exterior Aircraft surfaces;

(vii) the Aircraft must be returned with the same quantity of fuel as when delivered.

(viii) the Aircraft must be returned with manufacturer recommended inspections as well as all other Aircraft maintenance events due within ninety (90) days and/or One Hundred (100) hours (the "Lessee Return Inspections") completed by authorized service center facility of Lessor's choosing within the last ten flight hours and within seven days of Lessee's last use of the Aircraft. The Lessee Return Inspections will include compliance with all discrepancies, squawks and malfunctions, or other irregularities repaired and the Aircraft returned to service by the maintenance facility. Lessee shall provide to Lessor a list of all discrepancies discovered in the Lessee Return Inspections.

(ix) Prior to return of the Aircraft, Lessor shall be entitled to an acceptance flight of not more than two hour's duration at Lessor's expense. Lessor shall be entitled to have two (2) representatives on such flight, one of which shall be pilot-in-command.

The Return Inspection and any further airworthiness discrepancies discovered during such flight shall be promptly repaired or replaced at Lessee's sole expense prior to re-delivery to Lessor. Lessor must give specific notice to Lessee in writing of any airworthiness discrepancies that must be addressed to return the Aircraft in the condition required hereunder.

(x)     The Aircraft shall be waxed and cleaned inside and out by corporate standards. Lessee shall remove all its markings and the Aircraft restored to its condition at delivery, normal wear excepted.

(C)     <u>Failure to Meet Return Condition</u>. If Lessee does not return the Aircraft in accordance with the above condition, Lessor may make or cause to be made any repairs reasonably necessary to restore the Aircraft to the required condition and Lessee shall reimburse Lessor for any reasonable costs, expenses and fees including, without limitation, reasonable fees and expenses for repairs and lost rentals at the rate of One Thousand Five Hundred U.S. Dollars ($1,500.00) per day related to such restoration. In the event the cost to cause the Aircraft to meet the return conditions require more than the Initial Rent Payment, then Lessee shall reimburse Lessor for such difference within five (5) days of written demand, for any reasonable costs, expenses and fees including, without limitation, reasonable fees and expenses for repairs and lost rentals at the rate of One Thousand Five Hundred U.S. Dollars ($1,500.00) per day related to such restoration.

13.     <u>Taxes</u>. Lessee shall pay, and indemnify, defend and hold harmless Lessor from all license and registration fees and all sales, use, customs, value added, personal property and other taxes, levies, duties, charges or withholdings of any nature (together with any penalties, fines or interest thereon) (collectively, "Taxes") imposed against Lessor by any federal, state, provincial or local government or taxing authority upon or with respect to the use or operation of the Aircraft hereunder, upon the rentals, receipts or earnings arising there from or upon or with respect to this Agreement (other than, taxes on, or measured by, the net income of Lessor from the Rent paid by Lessee). The obligations of Lessee under this Section 13 shall survive the termination of this Agreement.

14.     <u>Liens, Encumbrances and Rights of Others</u>. Lessee will not directly or indirectly create, incur, or permit any mortgage, pledge, lien attachment, charge, encumbrance or right of others whatsoever on or with respect to the Aircraft, title thereto or any interest therein at any time during the term of the Agreement and any extensions thereafter or while the Aircraft is in the command and control of Lessee. Lessee will promptly, at Lessee's sole expense, cause any such mortgage, pledge, lien, attachment, charge, encumbrance or right of others which may arise at any time to be duly discharged, dismissed and removed as soon as possible, but in any event within ten (10) days after the existence of the same shall have first become known to Lessee. The obligations of Lessee under this Section 14 shall survive the termination of this Agreement.

15.     <u>DISCLAIMER OF WARRANTIES</u>. LESSEE ACKNOWLEDGES THAT LESSOR HAS NOT MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, CONDITION, AIRWORTHINESS, MERCHANTABILITY, DESIGN, OPERATION, OR FITNESS FOR USE OR A PARTICULAR PURPOSE OF THE AIRCRAFT, AGAINST INTERFERENCE OR AS TO THE FREEDOM OF THE AIRCRAFT FROM LIENS, ENCUMBRANCES OR RIGHTS OF OTHERS, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE AIRCRAFT.

16.    Indemnity.  Lessee hereby assumes liability for, and shall indemnify, protect, and save harmless Lessor, its shareholders, directors, employees and agents, from and against, and shall pay Lessor promptly upon demand the amount of any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements, including legal expenses, of whatsoever kind and nature, imposed on, incurred by or asserted against Lessor in any way relating to or arising out of this Agreement or the delivery, possession, use or operation of the Aircraft, unless due to the gross negligence of Lessor.  The indemnities contained in this Section 16 shall continue in full force and effect notwithstanding the expiration or other termination of this Agreement.

17.    Default. The following events shall constitute events of default ("Events of Default") hereunder:

(A)    Lessee shall fail to make any payment of Rent, Excess Utilization Charges, Engine Reserves, or any other payment due under this Lease as and when due and such failure shall continue un-remedied for a period of ten (10) days after written notice thereof is given by Lessor to Lessee; or

(B)    Lessee shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder, and such failure shall continue without remedy for a period of ten (10) days after written notice thereof is given to Lessee by Lessor; or

(C)    Any representation or warranty made by Lessee herein or in any document(s) or certificate(s) furnished Lessor in connection with this Lease shall have been false in any material respect when made or furnished; or

(D)    Lessee ceases doing business as a going concern, a petition is filed by or against Lessee under the bankruptcy act or any amendment thereto, and is acquiesced in or is not dismissed within thirty (30) days or results in an adjudication in bankruptcy, or a temporary or permanent receiver is appointed for Lessee or any of its property, Lessee commits any act of bankruptcy, makes an assignment for the benefit of its creditors, or offers any composition or extension of any of its indebtedness, dissolves or becomes insolvent; or

(E)    Lessee shall fail to procure or maintain the insurance coverage prescribed herein; or

(F)    An order, judgment or decree of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or, in any insolvency, readjustment of debt, marshalling of assets or liabilities or similar proceedings of or relating to Lessee or relating to all of or any substantial part of its property, or the winding up or liquidation of its affairs, shall have been entered against Lessee, and such decree or order shall have remained in force undischarged or unstayed for a period of thirty (30) days from the date of entry thereof, or

(G)    Lessee shall fail to pay any Taxes when due.

18.  Remedies.  Upon the occurrence of any Event of Default and at any time thereafter so long as the same shall be continuing, Lessor may, at its option, declare this Lease to be in default and at any time thereafter, so long as Lessee shall not have remedied all outstanding defaults, have and exercise all remedies provided at law or in equity, including without limitation, the following:

(A)   Declare the entire amount of Rent hereunder immediately due and payable and accelerate the terms of this Lease and declare the full amount of Rent payments for the remaining Lease Term and Additional Term, if applicable, immediately due and payable and to sue for and receive all such payments and other amounts then due or thereafter accruing under this Lease, including reasonable attorneys fees; and

(B)   Recover from Lessee an amount equal to the aggregate of all unpaid sums due or to become due during the Lease Term and any extension(s) if applicable; and

(C)   Lessee shall immediately stop flying the Aircraft and return the Aircraft to Lessor at any point in the United States designated by Lessor; and

(D)   Terminate this Lease and retain all prior payments of Rent; retake possession of the Aircraft as hereinabove provided for and retain all previously paid moneys as liquidated damages.  In the event of Lessor's repossession of the Aircraft, Lessor shall not be liable to Lessee for any damages occasioned by such taking or possession.

In addition, Lessee shall reimburse Lessor upon demand for all attorneys fees, court costs and other costs and expenses incurred by reason of the occurrence of any Events of Default, or the exercise of Lessor's remedies with respect thereto, including all costs and expenses incurred in connection with the return of the Aircraft in accordance with this Lease or in placing such Aircraft in the condition required by this Lease.  No remedy referred to in this Article is intended to be exclusive, but each shall be cumulative in addition to any remedy referred to above or available to Lessor at law or in equity; and the exercise or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all such other remedies.

19.  Assignment.  Lessee shall not, without the prior written consent of Lessor, whose consent may be withheld in its absolute discretion, assign any of its rights hereunder or permit the Aircraft to be operated or used by, or in the possession of, any party o hereunder, or any part thereof, to any other person with or without notice to Lessee.

20.  Notices. All notices, demands and requests contemplated by this Agreement shall be in writing and shall be deemed to have been delivered and received if served personally or sent by United States registered or certified mail, postage prepaid, return receipt requested, by receipt courier service or by telegraph, addressed to the addresses set forth or such other addresses as either party may designate by notice to the other:

If to Lessor:   Business Aircraft Leasing, Inc.
404 BNA Drive, Suite 305
Nashville, TN 37217
Attn:  Charles Mulle, President
Email:  cmulle@baliaircraft.com

If to Lessee:   MIRACLE ARENA

97 CACHET HILL CREST
WOODBRIDGE, ON LAH 156
Email: propheticpapa@yahoo.com

Any such notice shall be deemed delivered and received upon such personal delivery, delivery of the telegraph or at the time of delivery or attempted delivery shown on such return or courier receipt.

21.     At t orney's  Fees . In the event of any dispute, litigation or arbitration between the parties hereto with respect to the subject matter hereof, the unsuccessful party to such dispute, litigation or arbitration shall pay to the successful party all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred therein by the successful party, all of which shall be included in and as a part of the judgment or award rendered in such dispute, litigation or arbitration. For purposes of this Agreement, the term "successful party" shall mean the party which achieves substantially the relief sought, whether by judgment,  order  or otherwise.

22.     Further Instruments. Each party shall from time to time execute and deliver such further instruments as the other party may reasonably request to effectuate the intent of this Agreement.

23.     Execution and Counterparts. This Agreement may be executed and delivered in counterparts and by each party hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute one and the same instrument.

24.     Non-Waiver of Rights and Breaches. No failure or delay of either party hereto in the exercise of any right given such party hereunder shall constitute a waiver thereof unless the time specified herein for the exercise of such right has expired, nor shall any single or partial exercise of any right preclude other or further exercise thereof or of any other right. The waiver by a party hereto of any default of the other party shall not be deemed to be a waiver of any subsequent default or other default of such party.

25.     Entire Agreement; Modification. This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements, understandings and representations of the parties with respect to the subject matter hereof. This Agreement may not be modified, amended or supplemented or otherwise changed except by a writing executed by each of the parties and designated as a modification, amendment or supplemental hereof.

26.     No Agency or Partnership. Nothing in this Agreement shall be deemed to make either Lessor or Lessee an agent, partner or joint venturer of the other.

27.     Lessee Citizenship. Lessee hereby represents and warrants to Lessor that Lessee is a citizen or permanent resident of the United States within the meaning of title 14, Section 375.36 of the Code of Federal Regulations.

28.     Applicable Law and Jurisdiction. This Agreement shall be deemed to have been made and executed in Davidson County, Tennessee and shall be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State of

Tennessee. If Lessor is unable to serve Lessee at the address set forth in Section 21, or such other address as Lessee may provide to Lessor in writing, Lessee hereby designates the Secretary of State of the State of Tennessee as agent for the purpose of accepting service of process within the State of Tennessee. Should litigation arising out of or in any way related to the terms, conditions, and/or subject of this matter of this Agreement become necessary the parties further agree that the exclusive situs of such litigation will be Nashville, Davidson County, Tennessee. Furthermore, the venue shall be deemed to be proper only in Nashville, Davidson County, Tennessee, and the courts located there shall have exclusive in personam jurisdiction over said litigation.

29.     Due Organization. Lessee is and will continue to be a limited liability company duly organized and validly existing in good standing under the laws of the jurisdiction of its incorporation, is and will continue to be solvent and duly qualified to do business in good standing in each other jurisdiction where the conduct of this business requires it to be so qualified, and has and will continue to have the corporate power and authority to carry on its business and to enter into and perform its obligations under this Lease Agreement.

30.     Enforceability. Lessee and Lessor warrant that the terms and conditions of this Agreement were fully read and understood. If any one or more provisions of the Agreement shall be found to be illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

31.     Financial Statements. Lessee shall deliver to Lessor Lessee's quarterly balance sheet, income statement, and statement of cash flows of Lessee in reasonable detail according to generally accepted accounting principles as well as Federal Income Tax returns for the Guarantors. Lessor shall use commercially reasonable efforts to keep all such information confidential and not to disclose the same to any other party, except (a) Lessor's legal and accounting personnel; (b) prospective lenders on the Aircraft; (c) as Lessor shall deem necessary in connection with the enforcement of this Lease; and (d) as may be otherwise required by applicable law.

32.     TRUTH IN LEASING (See Federal Aviation Regulation FAR 91.23).

A.     FOR THE TWELVE MONTHS PRECEDING THE DATE OF THIS LEASE AGREEMENT, THE AIRCRAFT LEASED HEREUNDER HAS BEEN MAINTAINED AND INSPECTED IN ACCORDANCE WITH FEDERAL AVIATION REGULATIONS PART 91.

B.     THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER FEDERAL AVIATION REGULATIONS. FOR OPERATIONS UNDER THIS LEASE, LESSEE CERTIFIES THAT IT IS RESPONSIBLE FOR THE AIRCRAFT'S STATUS OF COMPLIANCE WITH APPLICABLE MAINTENANCE AND INSPECTION REQUIREMENTS AS SET FORTH UNDER THE REQUIRED FAA REGULATIONS APPLICABLE TO LESSEE'S USE AND OPERATION OF THE AIRCRAFT. IN ADDITION, LESSEE AGREES TO PROVIDE LESSOR WITH WRITTEN INSPECTION REPORTS FOR INSPECTIONS ACCOMPLISHED UNDER SAID PROGRAM.

C.     THE LESSEE IS SOLELY RESPONSIBLE FOR OPERATIONAL COMMAND AND CONTROL OF THE AIRCRAFT AND CERTIFIES AND AGREES TO COMPLY WITH ALL REGULATIONS ISSUED DURING THE TERM OF THIS LEASE AGREEMENT. LESSEE IS HEREBY ADVISED THAT AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FAA REGULATIONS CAN BE

OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE OR AIR CARRIER DISTRICT OFFICE.

E.     THE LESSEE SHALL COMPLY WITH ALL PARTS OF THE FEDERAL AVIATION REGULATIONS APPLICABLE TO THE OPERATION OF THIS CATEGORY AIRCRAFT, TO INCLUDE, BUT NOT LIMITED TO CARRYING A COPY OF THIS LEASE IN THE AIRCRAFT AT ALL TIMES.

*Signature Page Immediately Follows*

IN WITNESS WHEREOF, Lessor and Lessee have caused this Agreement to be duly executed by their respective officers or representatives thereunto duly authorized as of the day and year first above written.

LESSEE:                                    LESSOR:

MIRACLE ARENA                              BUSINESS AIRCRAFT LEASING, INC.


By: _____            By: _____


Print Name: _____            Print Name: _____


Title: _____           Title: _____

EXHIBIT I.
DELIVERY AND ACCEPTANCE CERTIFICATE

Lessor:      BUSINESS AIRCRAFT LEASING, INC.
Lessee:      MIRACLE ARENA
Location:    _____
Date:        _____

Manufacturer:  British Aerospace
Model:  HA-125-800A
Serial Number:  NA-0401 (258100)
Registration Number:  N180NE
Engine Make and Model:  Garrett TFE731-5R-1H
Engine Serial Number:  P-91311 and P-91312
APU Make and Model:  Sundstrand T61-40C8D-1
APU Serial Number:  K00027

This certificate is delivered by the undersigned pursuant to the Aircraft Lease Agreement dated as of January ___, 2015.

Lessee agrees that Lessor has delivered the Aircraft (including all pertinent operational equipment and maintenance logs and manuals) as described in the Aircraft Lease Agreement.

Lessee, or through its "Authorized Agent" has examined the Aircraft and represents that the Aircraft is good operating condition with all systems functional and operational. Lessee specifically states that it is knowledgeable and experienced in aircraft flight operations and that it does not rely upon any expertise of the Lessor in regard to the condition or acceptance of the Aircraft. Lessee confirms that the Aircraft is of the size, design, capacity, configuration and manufacture selected by it and irrevocably accepts said Aircraft "As Is, Where Is" for all the above. All logs and records have been examined and confirmed on Lessee's conformity inspection.

Total Airframe Hours:  _____          Landings:  _____
LH Engine Time Since New:  _____      LH Engine Cycles Since New:  _____
RH Engine Time Since New:  _____      RH Engine Cycles Since New:  _____
APU Time Since New:  _____            Fuel on Board:  _____lbs.

The undersigned hereby affirms that for purposes of this Certificate that they are the Lessee or its Authorized Agent.

LESSEE:                                          LESSOR:

MIRACLE ARENA                                    BUSINESS AIRCRAFT LEASING, INC.


By: _____                    By: _____

Print Name: _____                    Print Name: _____

Title: _____                    Title: _____



By: _____
    LESSEE'S INSPECTION
    REPRESENTATIVE

EXHIBIT II.
RE-DELIVERY AND ACCEPTANCE CERTIFICATE


Lessor:      BUSINESS AIRCRAFT LEASING, INC.
Lessee:      MIRACLE ARENA
Location:    _____

          Manufacturer:  British Aerospace
          Model:  HA-125-800A
          Serial Number:  NA-0401 (258100)
          Registration Number:  N180NE
          Engine Make and Model:  Garrett TFE731-5R-1H
          Engine Serial Number:  P-91311 and P-91312
          APU Make and Model:  Sundstrand T61-40C8D-1
          APU Serial Number:  K00027


        This certificate is delivered by the undersigned pursuant to the Aircraft Lease Agreement dated as of January ____, 2015.

        Lessee has delivered the Aircraft (including all pertinent operational equipment and maintenance logs and manuals) as described in the Aircraft Lease Agreement.

        Lessor, or through its "Authorized Agent" confirms that the Aircraft is fully assembled and in good working order and condition with all systems functional and operational.

Total Airframe Hours:  _____          Landings:  _____
LH Engine Time Since New:  _____      LH Engine Cycles Since New:  _____
RH Engine Time Since New:  _____      RH Engine Cycles Since New:  _____
APU Time Since New:  _____           Fuel on Board:  _____lbs.


The undersigned hereby affirms that for purposes of this Certificate that they are the Lessor or its Authorized Agent.

LESSEE:                                    LESSOR:

MIRACLE ARENA                              BUSINESS AIRCRAFT LEASING, INC.

By: _____       By: _____

Print Name: _____       Print Name: _____

Title:_____       Title: _____

EXHIBIT III

ATTORNEYS-IN-FACT

Pursuant to that certain Aircraft Lease Agreement (the "Agreement") dated January ____ , 2015 between MIRACLE ARENA (the "Lessee") and BUSINESS AIRCRAFT LEASING, INC (the "Lessor"), Lessee hereby appoints Lessor as its attorneys-in-fact to make proof of loss and claim for, and to receive payment of, and to execute and endorse all documents, checks or drafts on behalf of Lessee in connection with all policies of insurance in respect of the Aircraft other than insurance under clause 11(A)(i) in the Agreement.

The terms and conditions of the Agreement are incorporated herein by reference.

AGREED AND ACCEPTED by its authorized representatives this ____ day of January 2015.

LESSEE:                                              LESSOR:

MIRACLE ARENA                               BUSINESS AIRCRAFT LEASING, INC.

By: _____        By: _____

Print Name: _____        Print Name: _____

Title: _____        Title: _____

WITNESS FOR LESSEE                        WITNESS FOR LESSOR

By: _____        By: _____

Print Name: _____        Print Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

EXHIBIT IV.

<u>PERSONAL LEASE GUARANTY</u>

<u>Business Aircraft Leasing, Inc.</u>
Lessor

<u>404 BNA Drive, Suite 305</u>
Address

<u>Nashville</u>       <u>TN</u>      <u>37217</u>
City             State      Zip

Re:  Aircraft Lease

<u>MIRACLE ARENA</u>
Lessee

_____
Address

_____
City             State      Zip

Name and Date of Lease:  Lease of British Aerospace HA-125-800A, serial number NA-0401 (258100), FAA registration number N180NE dated January __, 2015

Each of us severally requests you as lessor to enter into certain lease agreement with the above-named lessee, dated as set forth above, and to induce you to do so and in consideration thereof and of benefits to accrue to each of us therefrom each of us, as a <u>primary</u> obligor, <u>jointly</u>, <u>severally</u> and <u>unconditionally</u> guarantees to you that the lessee will fully and promptly pay, when due, every rental installment and all other sums payable under such lease and perform all of lessee's present and future obligations to you under this lease, as the same may be modified, amended or extended, irrespective of any invalidity or unenforceability of any such obligation or the insufficiency, invalidity or unenforceability of any security therefor; and agrees, without your first having to proceed against the lessee or to liquidate the lease agreement or the leased property, to pay on demand the entire unpaid balance of the rentals and any other amounts due under said lease and to become due you from the lessee and all losses, costs, attorneys' fees or expenses which may be suffered by you by reason of lessee's default or default of any of the undersigned; and agrees to be bound by and on demand to pay any deficiency established by a sale of the lease and/or the leased property, with or without notice to us.  This guaranty is an unconditional guarantee of payment and performance.   No guarantor shall be released or discharged, either in whole or in part, by your failure or delay to perfect or continue the perfection of any security interest in any property which secures the obligations of lessee or any of us to you, or to protect the property covered by such security interest.

No termination hereof shall be effected by the death of any or all of us.  No termination shall be effective except by notice sent to you by certified mail return receipt requested naming a termination date effective not less than 90 days after the receipt of such notice by you; or

effective as to any of us who has not given such notice; or affect any transaction effected prior to the effective date of termination.

Each of us waives: notice of acceptance hereof; presentment, demand, protest and notice of nonpayment or protest as to any note or obligation signed, accepted, endorsed or assigned to you by lessee; all exemptions and homestead laws and any other demands and notices required by law; any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which any of us may now or hereafter have against the lessee or any other person directly or contingently liable for the obligations guaranteed hereunder, or against or with respect to the lessee's property (including, without limitation, property collateralizing its obligations to you), arising from the existence or performance of this guaranty; all setoffs and counterclaims; any and all defenses based on suretyship or any other applicable law, including without limitation all rights and defenses arising out of (i) an election of remedies by you even though that election of remedies may have destroyed rights of subrogation and reimbursement against the lessee by operation of law or otherwise, (ii) protections afforded to the lessee pursuant to antideficiency or similar laws limiting or discharging the lessee's obligations to you, (iii) the invalidity or unenforceability of this guaranty, (iv) the failure to notify any of us of the disposition of any property securing the obligations of the lessee, (v) the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property, and (vi) any duty on your part (should such duty exist) to disclose to any of us any matter, fact or thing related to the business operations or condition (financial or otherwise) of the lessee or its affiliates or property, whether now or hereafter known by you.

You may at any time, without our consent, without notice to us and without affecting or impairing the obligation of any of us hereunder, do any of the following:

(a)     renew, extend (including extensions beyond the original term of such lease), modify (including changes in rental or interest rates), release or discharge any obligations of lessee, of co-guarantors (whether hereunder or under a separate instrument) or of any other party at any time directly or contingently liable for the payment of lessee's obligations under the lease;

(b)     agree to the substitution of a lessee;

(c)     accept partial payments of lessee's obligations under the lease;

(d)     accept new or additional documents, instruments or agreements relating to or in substitution of lessee's obligations under the lease;

(e)     settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of lessee's obligations under the lease or the leased property in any manner;

(f)     consent to the transfer or return of the leased property and take and hold additional security or guaranties for lessee's obligations under the lease;

(g)     check our credit

(h)     amend, exchange, release or waive any security or guaranty; or

(i)      bid and purchase at any sale of the lease or the leased property and apply any proceeds or security, and direct the order and manner of sale.

If a claim is made upon you at any time for repayment or recovery of any amount(s) or other value received by you, from any source, in payment of or on account of any of the obligations of the lessee guaranteed hereunder and you repay or otherwise become liable for all or any part of such claim by reason of:

(a) any judgment, decree or order of any court or administrative body having competent jurisdiction; or

(b) any settlement or compromise of any such claim,

we shall remain jointly and severally liable to you hereunder for the amount so repaid or for which you are otherwise liable to the same extent as if such amount(s) had never been received by you, notwithstanding any termination hereof or the cancellation of any note or other agreement evidencing any of the obligations of the lessee.

This guaranty shall bind our respective heirs, administrators, representatives, successors, and assigns, and shall inure to your successors and assigns, including, but not limited to, any party to whom you may assign such lease, we hereby waive notice of any such assignment. All of your rights are cumulative and not alternative.

By execution of this guaranty each guarantor hereunder agrees to waive all rights to trial by jury in any action, proceeding, or counterclaim on any matter whatsoever arising out of, in connection with, or related to this guaranty.

This guaranty is made and shall be construed under the laws of the State of Tennessee.

Dated: _____2015

_____Individually
(Name) _____
(Home Address) _____
(Home Phone Number): _____
(Mobile Phone Number): _____
(Office Phone Number): _____
(Social Security Number): _____
(Date of Birth): _____
(Driver's License State and Number): _____


Witness_____
Witness Name: _____
Home Address _____

## SCHEDULE A
## AIRCRAFT EQUIPMENT CHECKLIST

Avionics

_____ Collins EFIS-85 EFIS System
_____ Collins APS 85 Autopilot/Flight Director
_____ Dual Collins VHF-22B Comms
_____ Dual Collins VIR-32 Navs
_____ Dual Collins ADF-60 ADFs
_____ Dual Collins DME-42 DMEs
_____ Dual Collins TDR-94D Transponders
_____ Dual Collins ADS-82 Air Data Computers
_____ Dual Collins AHC-85 AHRS

_____ Collins TCAS 94 TCAS II, Change 7
_____ Collins WXR-850 Radar
_____ Collins ALT-55B Radar Altimeter
_____ Dual Collins RMI-30 RMIs
_____ Dual Universal UNS-1B FMS w/GPS
_____ Dual King KHF-950 HF w/SELCAL
_____ Fairchild A-100 CVR
_____ Flitefone VI
_____ Stormscope WX-1000

Additional Equipment

_____ Tell Tail Logo Lights
_____ Baker Audio System
_____ Nose Taxi Lights
_____ Long Range O2
_____ Artex C406N (406 MHz) ELT

_____ Aft four-place club seating
_____ Coffee Maker
_____ DVD Player
_____ Sirius Satellite In-flight Information System

_____ Thrust Reversers
_____ Teledyne Angle of Attack
_____ Dual Davtron Clocks
_____ Right Hand Ice Light
_____ Three-place divan opposite one single seat
_____ Microwave Oven
_____ Two Flat Screen monitors
_____ CD/MP3 Player

Aircraft Documents:

_____ FAA Certificate of Airworthiness

_____ FAA Registration Certificate

Loose Equipment

____ Fly Away Bag:
    _____ 1 each Rigging pin set all 16 pin included in box
    5 each open wrenches
        _____ 1 each (1"-7/8")
        _____ 2 each (11/-3/4"
        _____ 1 each (5/8"-11/16")
        _____ 1 each (7/16"-1/2")
    3 each handle wrenches
        _____ 1 each WB-808-10UNF
        _____ 1 each WB-808-GUC
        _____ 1 each WB-80-1146
    _____ 1 each Jack Pad Box
        _____ 2 each MLG pads 25Y67A
        _____ 1 each Tail Pad 25Y13A
    _____ 1 each Nose Gear Axle Spanner 25Y257A
    _____ 1 each T Handle (drain plug tool)
    _____ 1 each MLG Wheel Spanner (two parts)

SCHEDULE A
AIRCRAFT EQUIPMENT CHECKLIST, cont.

Loose Equipment, cont.
    Aircraft Galley:
        _____4 each alcohol dispensers
        _____2 each Hot & cold Liquid Dispenser
        _____1 each Portable Universal Data Base Loader
        _____1 each Box of Loose Jepps& Nav Database floppies
        _____1 each Toshiba Remote Control
        _____2 each Umbrellas
        _____1 each cockpit Window Covers (sun shades) paper
        _____1 each DVD Player mounted
        _____1 each Remote

    Cockpit & Entry
        _____1 each Aircraft Flight Manual
        _____2 each Crew Manual vol 1 & 2
        _____1 each Air Crew Manual Checklist
        _____1 each Hawker 800 Pilot Operation Handbook
        _____1 each PBE
        _____2 each Smoke Goggles
        _____1 each Operators Manual Flitefone VI
        _____1 each UNS Operators Checklist
        _____1 each Headset with Mic (in baggage area)
        _____1 each King KHF 950 Pilots Guide
        _____1 each Maintenance Rug Runner
        _____1 each Fire Axe
        _____2 each Flashlights
        _____14 each Life Vests

    Books
        _____1 each Major Repair, FAA 337's & STC
        _____1 each Book AD's
        _____2 each Engine Log Books old
        _____2 each Engine Log Books new
        _____2 each Aircraft Completion Print Books
    4 each Airframe Logbooks
            _____1 each Mod Book
            _____1 each APU Book
            _____2 each Weight & Balance Book

    Covers
        _____1 each set of Engine Cover & APU covers intakes and exhaust
        _____1 each Door Open Cable
        _____3 Pitot Covers
        _____Set of Static Port Plugs 25Y1907-1A left
        _____Set of Static Port Plugs right

Loose Equipment, cont.
    Covers, cont.
        _____1 each Stall Vent Plug P/N 25Y1185A
        _____2 each Set of T/R Pin Plates Assy #54750201-1
    Keys
           _____1 each Main Entrance
           _____1 each Small Key
        _____5 each small throw rugs
        _____1 each Seat Belt Extender

AGREED AND ACCEPTED
Lessee:  MIRACLE ARENA

By: _____

Date: _____