# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

COSTA & GRISSOM MACHINERY
COMPANY, INC. and COSTA
LEVIGATRICI S.p.A.,

       Plaintiffs,

      v.

QINGDAO GIANTWAY MACHINERY
CO., LTD. and LOBO MACHINERY
CORPORATION,

      Defendants.

CIVIL ACTION
NO. 1:08-CV-2948-CAP

**O R D E R**

    This matter is now before the court on defendant Qingdao
Giantway Machinery Company, Ltd. and defendant Lobo Machinery
Corporation's (collectively, "Giantway") motion to dismiss and
motion for sanctions [Doc. No. 95] and on Giantway's motion for
partial summary judgment [Doc. No. 96].  Also pending are the
plaintiffs' consent motion for withdrawal of counsel [Doc. No. 147]
and a motion by the plaintiffs' former counsel, the law firm of
Adorno & Yoss, for leave to file a surreply [Doc. No. 150].

**I.**   **Case Overview**

    Plaintiff Costa & Grissom Machinery Company, Inc. ("CGMC") is
a North Carolina company that markets a wide-belt sander "A" series
machine ("A series machine") produced by Plaintiff Costa
Levigatrici S.p.A. ("CL"), an Italian company.  According to the
complaint, the A series machine is an all-purpose sanding center

controlled by a touch screen PC and software. It is built on a heavy-duty modular frame that can accommodate up to six interchangeable working units. In August 2008, CGMC was setting up an exhibit for the A series machine at the annual International Woodworking Fair ("IWF"), the largest woodworking show in the western hemisphere, when CGMC's employees saw a display by defendant Qingdao Giantway Machinery Co., Ltd., a Chinese company. Qingdao's display included a machine ("the IWF machine") with defendant Lobo Machinery Corporation's ("Lobo") logo on its front panel. CGMC contends that, with the exception of the logos on the machines, the IWF machine is identical to its A series machine. CGMC also contends that Giantway copied portions of CGMC's brochure for the machine.

In its original and proposed first amended complaint, CGMC alleged that the defendants removed the CGMC and CL logos from one of CGMC's A series machines, affixed Lobo's labels on the front of the machine, and attempted to pass the machine off as their own. Based on these allegations, CGMC claimed that the defendants had engaged in unfair competition, deceptive trade practices, and tortious interference with contractual relations, business relations, or potential business relations. CGMC sought a temporary restraining order ("TRO"), injunctive relief, and seizure

of Giantway's machine, papers, and documents located in the state of Georgia. In addition, CGMC sought various damages.

On August 21, 2008, CGMC filed its complaint and a motion for a TRO, interlocutory injunction, seizure of counterfeit products, and expedited discovery in the Superior Court of Fulton County. The day after the complaint and motion for a TRO was filed, the Fulton County Superior Court held an emergency hearing on the TRO motion. Giantway was not represented by counsel at the hearing. As a result of that hearing, the court ordered Giantway to surrender the IWF machine to CGMC and to immediately deliver to CGMC copies of all documents reflecting sales orders, sales prospects, and sales contacts that the defendants had made at the IWF. The court instructed CGMC to absorb all costs associated with obtaining and returning the machine, and further required CGMC to report its findings concerning the source and origin of the IWF machine to the court at a preliminary injunction hearing scheduled for September 22, 2008. In the meantime, the court permitted the parties to engage in limited discovery.

On September 19, 2008, Giantway removed the case to this court. On September 23, 2008, CGMC filed the report it prepared at the direction of the Fulton County Superior Court regarding the origin of the IWF machine ("the report") [Doc. No. 5]. On September 26, 2008, Giantway filed its answer and counterclaim to

-3-

CGMC's complaint [Doc. No. 12]. In the answer, Giantway denied CGMC's allegations. In addition, Giantway asserted counterclaims for wrongful seizure, product disparagement, defamation, tortious interference with business relationships, tortious interference with prospective business relations, and attorneys' fees. For relief, Giantway requested dismissal of CGMC's complaint, an order requiring CGMC to return the IWF machine to the defendants, compensatory and punitive damages, the costs of this action, and interest.

On October 15, 2008, CGMC filed a motion for leave to add CL as a plaintiff to this action and to further amend the complaint [Doc. No. 16]. Thereafter, on October 20, 2008, CGMC answered Giantway's counterclaims [Doc. No. 21]. In its answer, CGMC denied Giantway's allegations and denied that the defendants were entitled to any relief. Giantway opposed in part CGMC's motion to amend [Doc. No. 27]; thus, the court did not rule on it immediately.

On November 7, 2008, the undersigned held a telephone conference on Giantway's motion to compel the posting of a bond [Doc. No. 3], filed on the same day that this case was removed to this court. At the conference, the court determined that a bond was warranted under O.C.G.A. § 10-1-451 because CGMC was still in possession of the IWF machine. That same day, the court issued a written order granting the motion to compel the posting of bond and

-4-

requiring CGMC to file with the clerk of court a $200,000 surety bond within ten days of the date of the order [Doc. No. 29].

After the court's order compelling the posting of a bond, this litigation devolved into a contentious motions practice. On November 24, 2008, CGMC - which had not yet posted its bond[1] - filed a motion and brief misconstruing this court's order compelling the posting of a bond and essentially asking the court to reconsider it [Doc. No. 31]. On December 3, 2008, Giantway filed a motion to compel a complete interrogatory response and motion for sanctions [Doc. No. 36] as well as a motion to compel a Rule 30(b)(6) deposition and motion for sanctions [Doc. No. 37]. On December 30, 2008, Giantway filed a motion and memorandum of law for Rule 11 sanctions [Doc. No. 41]. On that same day, before this court had the opportunity to rule on CGMC's first, contested, motion to amend the complaint, CGMC filed another motion to amend the complaint [Doc. No. 43]. Soon thereafter, CGMC contacted the undersigned's chambers to request a conference on all pending motions. The court instructed the parties to file a joint status report listing each of the motions upon which a hearing was requested [Doc. No. 46]. The parties complied with this order on

---

[1] The court notes that CGMC did not post a bond as ordered by the court in its November 7, 2008 order [Doc. No. 29] until threatened with sanctions more than four months after the original date the bond was due.

-5-

February 11, 2009 [Doc. No. 57], but, based on the assertions made by the parties, the court concluded that no hearing was necessary. As the parties continued to file motions, the court began the laborious task of addressing the motions identified in the parties' joint status report.  On March 24, 2009, this court issued a 47-page order [Doc. No. 80] addressing the parties' motions and conduct.  In that order, the court first granted in part and denied in part CGMC's motions to amend [Doc. Nos. 16 and 43].  It granted CGMC's motions to amend to the extent that they sought to add CL as a plaintiff.  Moreover, the court allowed CGMC to dramatically alter the scope of this case, changing it from a reverse-palming off case to a trade dress infringement action.  The court next granted in part and denied in part Giantway's motion for Rule 11 sanctions [Doc. No. 41].  The court concluded that CGMC had blatantly misrepresented the seizure statute before the Fulton County Superior Court and this court, leaving out critical words that would have made CGMC's seizure of the machine unlawful.  The court granted Giantway an award of its attorneys' fees incurred in filing the motion.  Importantly, the court denied Giantway's motion for Rule 11 sanctions to the extent that it sought sanctions for CGMC's failure to withdraw its reverse palming off claims after its initial examination of the machine in September 2008.  In making this determination, the court concluded that CGMC was entitled to

-6-

additional discovery to explore these claims before sanctions were warranted for failure to withdraw them. The court denied CGMC's motion to vacate or reconsider the November 7, 2008, order requiring the posting of bond and denied CGMC's motion to reduce the amount of the bond that it was required to post. The court considered imposing sanctions against CGMC for failing to post the bond as directed, but the court ultimately exercised leniency and gave CGMC additional time to post the bond. The court warned CGMC that it would immediately impose sanctions if it again failed to comply with its directives regarding the bond.

Next, the court granted in part and denied in part Giantway's motion to compel an interrogatory response and motion for sanctions [Doc. No. 80]. The court, having granted CGMC leave to drastically alter the scope of the case, declined to compel a response to the interrogatory until after the parties had conferred. However, the court noted that Giantway filed the motion to compel in advance of CGMC's second motion for leave to amend the complaint, and further noted that - had CGMC not filed that second motion for leave to amend - the entry of an order compelling discovery would be appropriate. In making this finding, the court concluded that CGMC's failure to adequately respond to the interrogatory or to make timely objections sounded in bad faith; accordingly, the court

-7-

awarded Giantway its expenses and attorneys' fees incurred in preparing the motion to compel.

Finally, the court addressed Giantway's motion to compel a Rule 30(b)(6) deposition and motion for sanctions [Doc. No. 80]. Although CGMC had produced its president and 10% owner, Scott Grissom, for a Rule 30(b)(6) deposition, it appeared from the testimony given during the deposition that Grissom had done nothing of substance to prepare for his deposition. For example, although Grissom was clearly on notice that he needed to testify regarding the study that CGMC conducted on the IWF machine and the ensuing report, he and his then-attorney, Cary Ichter, clarified that he did not review the report addressing the study's results prior to his deposition. In the order, the court referred to the following excerpt from Grissom's deposition testimony to demonstrate his lack of preparation and his attorney's reinforcement of that lack of preparation:

> A:   I'm saying that I don't know what's in the report. I do not remember. It's been a month, over a month or right at a month.
>
> Q:   I think you said that you studied it preparing for today, didn't you?
>
> MR. ICHTER:   No, he didn't say that. He said he looked at the 30(b)(6) notice.

>               MR. WHEAT:    You're correct.  I apologize.
>                             He did say he didn't do any
>                             studying preparing for today.
>
>               Mr. ICHTER:   That's right.

Grissom Dep. at 72:14-24 [Doc. No. 136].  Because the court found

that Grissom's deposition was a waste of time for both parties, it

granted Giantway's motion to compel and allowed Giantway to conduct

a continued Rule 30(b)(6) deposition.   In addition, the court

concluded that sanctions were appropriate in the form of attorneys'

fees for time spent at and in preparation for the deposition and

for time spent preparing for and filing the motion to compel.

However, the court concluded that the attorneys' fees awarded

should be borne not by CGMC, but rather by its counsel.  The court

made this determination after reviewing the following statement of

CGMC's counsel (now former counsel), Cary Ichter, contained in a

footnote in CGMC's response to the motion to compel.

>               As lead Attorney of record for CGMC and the
>               signatory of this Response, I hereby confirm and
>               certify that I spent four hours with Mr. Grissom
>               on October 15, 2008 preparing him for his 30(b)(6)
>               deposition.   Mr. Grissom and I reviewed
>               Defendant's 30(b)(6) deposition notice, discovery
>               requests, CGMC's Report and possible questions
>               that Defense counsel may ask Mr. Grissom during
>               his deposition.   As lead counsel, I made a note
>               during Mr. Grissom's deposition to correct his
>               statement that other than reviewing Defendants'
>               30(b)(6) notice, he had not prepared for his
>               deposition.  However, during the deposition I was
>               substituted by co-counsel to attend a previously

-9-

> scheduled conference.  It was my intention to
> correct the record; however, Defense counsel
> abruptly terminated the deposition before the
> record could be corrected.  The fact that Defense
> counsel has made a mountain out of this molehill
> shows the extent to which Defendants are pushing
> to avoid trying this case on the merits --
> preferring instead to focus on contrived discovery
> disputes.

Pl.'s Resp. Br. to Mot. to Compel Rule 30(b)(6) Dep. at 8 [Doc. No.
44].  In light of Ichter's interjection on the record during the
deposition indicating that Grissom did not look at the report, the
court found that it had two options.  First, it concluded that it
could find Icther's certification cited above to be completely
untruthful.  On the other hand, the court concluded that it could
find that at least portions of Icther's certification were
accurate, but then it concluded that it would be faced with the
finding that Ichter suborned perjury with his interjection during
the deposition.  The court ultimately concluded that Ichter's
actions, under either scenario, violated the integrity of the
judicial system.  Accordingly, it directed Ichter to pay the
attorneys' fees granted to Giantway in regard to the motion to
compel.

    At the conclusion of its order, the court noted that there
were many discovery motions still pending on the docket.  However,
in light of the significant amendments to the complaint, it noted
that it would not rule on those motions until after the parties had

-10-

an opportunity to reevaluate their discovery requests and contentions. Accordingly, the court directed the parties to file a joint report within twenty days regarding the status of their pending motions and outstanding discovery requests to date.

After the court issued its March 24, 2009, order, CGMC filed its amended complaint [Doc. No. 83] adding CL as a party and reducing and transforming this action from a reverse palming off action to a single-count trade dress infringement case. Also, CGMC finally deposited the $200,000.00 bond with this court four months late and only after being threatened with sanctions. Giantway filed declarations in regard to the attorneys' fees incurred in this case and awarded by this court [Doc. No. 85]. On April 6 and April 23, 2009, CGMC filed a motion for reconsideration of this court's March 24, 2009, order and a notice of appeal, respectively. This court denied the motion for reconsideration on June 11, 2009 [Doc. No. 114]. On July 24, 2009, the Eleventh Circuit dismissed CGCM's appeal sua sponte for lack of jurisdiction [Doc. No. 124]. Meanwhile, the parties continued to file motions, responses and reply briefs, including Giantway's motion to dismiss and motion for sanctions [Doc. No. 95] and Giantway's motion for partial summary judgment [Doc. No. 96].

On August 24, 2009, this court held a hearing on the pending motions. As a result of that hearing, all pending discovery

-11-

motions were dismissed as moot or were withdrawn.  In an order
dated August 25, 2009, the court dismissed the plaintiffs' still-
pending motion for a TRO as moot [Doc. No. 141].  The court further
noted that it would reopen discovery if this case goes forward.
The court spent the balance of the hearing listening to the
parties' arguments regarding the pending motion to dismiss and
touching briefly upon the pending motion for partial summary
judgment.  The court will address each of these motions in turn.

## II. **Giantway's Motion to Dismiss and Motion for Sanctions [Doc. No. 95]**

In Giantway's motion to dismiss, it essentially contends that
CGMC has engaged in such reprehensible behavior and abuse of the
judicial process that this court should dismiss the plaintiffs'
complaint and award Giantway its attorneys' fees and costs incurred
in defending against this action.  Although Giantway recognizes
that CL was not added as a plaintiff to this action until March 30,
2009, Giantway contends that dismissal is appropriate as to both
plaintiffs because CL is the manufacturer of CGMC's machines and is
represented by the same attorneys that represent CGMC.  Giantway
further contends that CL's exclusive United States distributor is
CGMC and that CGMC is a subsidiary or affiliate of CL.  Giantway
also argues that there is no doubt that CL is as much a driver
behind this litigation as CGMC because discovery that should have

-12-

been produced, showing that Giantway's machine and the plaintiffs' machines are not identical, is discovery that ultimately would have been in the possession, custody, or control of CL, and CL could and should have authorized their counsel to produce it.  At a minimum, CGMC argues that CL, as the parent and manufacturer of the machine, was in a position to insist that CGMC cooperate in discovery and litigate this case in good faith.

Giantway alleges that this case has, in large part, been a sham; accordingly, it contends that dismissal is appropriate.  In support of its theory of dismissal, Giantway focuses upon three main points: (1) CGMC misrepresented the Georgia seizure statute to this court and the Fulton County Superior Court by leaving out critical words that would have invalidated its request to seize the machine; (2) Scott Grissom, CGMC's Rule 30(b)(6) deponent, intentionally falsified his testimony during his deposition regarding his level of preparation; and (3) CGMC maintained reverse palming off claims until it filed its motion for leave to file a second amended complaint on December 30, 2008, despite knowing that the IWF machine was not the same size as any A series machine. Each of these contentions, along with CGMC and CL's responses, is discussed below.

-13-

A.    **Arguments for Dismissal**

  1.    **CGMC misrepresented the Georgia Seizure Statute.**

As discussed above, the court - in its March 24, 2009, order, sanctioned CGMC pursuant to Rule 11 for omitting words in its recitation of O.C.G.A. § 10-1-451 that would have made the seizure of Giantway's machine inappropriate.  As a penalty, the court required CGMC's counsel to pay all fees incurred by Giantway in filing the portion of the Rule 11 motion and memoranda that related to CGMC's misrepresentations.  The court further noted that it would address any additional damages caused by CGMC's misrepresentations when addressing Giantway's counterclaim alleging wrongful seizure.

In its motion to dismiss, Giantway reminds the court of CGMC's misrepresentation of the law to demonstrate that it was CGMC's goal to improperly and unlawfully engage in this litigation for the purpose of injuring and discouraging competitors.  In defense, CGMC continues to argue that it did not quote O.C.G.A. § 10-1-451 and that it misrepresented the statute unintentionally in its race to seize the machine before it went back to China.[2]  CGMC contends

_____

    [2]  The court notes that indeed there are no quotation marks around the language used in CGCM's complaint that is followed by the statute citation.  The first sentence of the statute, however, is repeated verbatim with the exception of seven words within the sentence that established a condition precedent to invoking the statute.  The seven omitted words are the requirement that the

-14-

that it has already been sanctioned for this mistake; thus, it contends that no further sanctions are warranted.

> **2.    Scott Grissom, CGMC's Rule 30(b)(6) deponent, intentionally falsified his testimony given under oath regarding his level of preparation for his deposition.**

Giantway next contends that dismissal and sanctions are appropriate in this case because of Grissom's perjured testimony regarding his preparation for CGMC's Rule 30(b)(6) deposition. As noted above and as detailed in this court's March 24, 2009, order, Grissom unequivocally testified at his deposition that he had done nothing to prepare for his deposition other than reviewing the Notice of Deposition and its exhibits. See Dep. of Scott Grissom at 4:25-12; 72:14-24 [Doc. No. 136]. He stated that he had not reviewed the report that CGMC prepared on the source and origin of the IWF machine in at least a month. He answered "I don't know" and "I can't remember" to many questions after long pauses. As noted above, in the March 24, 2009, order, the court - under the belief that Grissom had not prepared - ordered a continued Rule 30(b)(6) deposition and ordered CGMC's attorney to pay the costs and fees Giantway incurred for time spent at and in preparation for

---

movant be the owner of a trademark registered under Georgia law. It is relevant to point out that inclusion of these seven words would have shown the court adjudicating the TRO that CGCM did not qualify for the protection offered by the statute because CGCM did not own a trademark registered under Georgia law.

the deposition and for time Giantway spent preparing for and filing
the motion to compel. Now, in its motion to dismiss, Giantway
contends that Grissom was untruthful about his level of preparation
in his deposition because Grissom, in an affidavit filed on April
3, 2009, stated that:

> The day before the deposition, on October 15,
> 2009, I met with CGMC's counsel Cary Ichter in
> his office. We spent several hours together at
> that time preparing for the deposition. The vast
> majority of the time we spent preparing for the
> deposition was spent reviewing a report that I
> had assisted in preparing regarding the machine
> at issue in this case ("the Report"). During the
> course of our meeting, Mr. Ichter and I discussed
> the contents of the Report (the narrative
> portions and the attached photographs), the
> subjects that Mr. Ichter expected would be
> covered in the deposition based upon the Notice
> of Deposition, the issue that the case presented,
> and the like. I recall spending a significant
> amount of time reviewing the report during our
> time together. Mr. Ichter and I met again the
> morning of the deposition for approximately one
> hour to continue to prepare for the deposition.
> I cannot account for why it is I incorrectly
> answered the question, and at the moment, I
> cannot recall exactly what I was thinking at the
> time. I was, however, very nervous and, as a
> consequence, forgetful before the deposition and
> once the deposition began.

Grissom Aff. at ¶¶ 5-8 [Doc. No. 86, Ex. 4]. Giantway argues that,
in light of Mr. Grissom's contradictory testimony, it is clear that
he was untruthful either in his deposition or in his affidavit.

In defense, CGMC and CL argue that CGMC did not commit perjury
regarding preparation for the Rule 30(b)(6) deposition. The

-16-

plaintiffs acknowledge that Grissom "screwed up," but contend that he had no willful intent to testify falsely and that he simply made a mistake. CGMC and CL argue that Grissom had no reason to falsely testify about his level of preparation. They argue that they never corrected Grissom's testimony because the deposition was suspended rather than concluded. They also contend that it is unclear in this circuit as to whether substantive changes can be made via an errata sheet. They seem to imply that they did not correct Grissom's testimony via an errata sheet because it would be considered a substantive change to an answer.

### 3. CGMC maintained a reverse palming off claim despite knowing that the Giantway machine was not the same size as any of CGMC's A series machines.

On December 30, 2008, CGMC filed its second motion to amend its complaint. In this motion, CGMC proposed dropping its reverse palming off claim, which had formed the basis of its original complaint, and adding a trade dress infringement claim. The court allowed it to do so, noting Giantway's argument that CGMC should have dropped its reverse palming off claims in September 2008 when the report prepared at the direction of the Fulton County Superior Court provided no evidence that Giantway modified an A series machine and displayed it as its own. At the time, the court declined to sanction CGMC for not withdrawing the reverse palming

-17-

off claims earlier because it concluded that CGMC had not yet had an adequate opportunity to explore those claims.

Now, Giantway once again moves for sanctions on the basis of CGMC's failure to timely withdraw the reverse palming off claims. Giantway argues that CGMC's amended responses to Giantway's Requests for Admissions ("RFAs") demonstrate that CGMC knew as early as September 2008, when it prepared the original report, that the Giantway machine was not an A series machine because it was not the same size as any of the A series machines. It argues, however, that CGMC kept this information secret until after Giantway moved to compel the production of technical drawings reflecting the size of the A series machines. The relevant RFAs, original responses, and amended responses are detailed below:

> **RFA 1.** Admit that the outer cover of the machine displayed by or on behalf of Qingdao Giantway Machinery Co., Ltd. at the International Woodworking Fair (the "Qingdao Machine") is not the exact dimensions as the outer cover of any of Plaintiff's Wide-Belt Sander "A" Series Machines (the "A Series Machines").
>
> **2/11 Response:** Plaintiff objects to Request No. 2 on the grounds that is vague, ambiguous, overly broad, and unduly burdensome because each and every A Series Machine is manufactured to the client's specifications. Plaintiff further objects to Request No. 2 to the extent it requests information not presently within the possession, custody, or control of CGMC. Each and every A Series machine manufactured by CGMC is no longer in its control, and CGMC cannot inspect and compare the Qingdao machine

-18-

> to each and every A Series Machine.  CGMC, therefore, denies this request.

*2/26 Response:* Admitted.

**RFA 2.**    Admit that the outer cover of the Qingdao Machine is not the exact size as the outer cover of any A Series Machines.

*2/11 Response:* Plaintiff objects to Request No. 2 on the grounds that is vague, ambiguous, overly broad, and unduly burdensome because each and every A Series Machine is manufactured to the client's specifications.  Plaintiff further objects to Request No. 2 to the extent it requests information not presently within the possession, custody, or control of CGMC. Each and every A Series machine manufactured by CGMC is no longer in its control, and CGMC cannot inspect and compare the Qingdao machine to each and every A Series Machine.  CGMC, therefore, denies this request.

*2/26 Response:* Admitted.

**RFA 3.**    Admit that neither the dimensions nor the size of the outer cover of the Qingdao Machine corresponds with the dimensions or size specified in the technical drawings for the A Series Machines.

*2/11 Response:* Plaintiff objects to Request No. 3 on the grounds that is vague, ambiguous, overly broad, and unduly burdensome because each and every A Series Machine is manufactured to the client's specifications.  The request also does not specify which set of technical drawings Defendants want to compare the Qindgao Machine to.  CGMC, therefore, denies this request.

*2/26 Response:* Admitted.

-19-

**RFA 4.**          Admit that during Plaintiff's examination of
the Qingdao Machine, Plaintiff noted that the
cover of the Qingdao Machine is not the exact
dimensions as the cover of any of the A Series
Machines.

***2/11 Response:*** Plaintiff objects to Request No. 4 on the
grounds that is vague, ambiguous, overly
broad, and unduly burdensome because each and
every A Series Machine is manufactured to the
client's specifications.  Plaintiff further
objects to Request No. 4 to the extent it
requests information not presently within the
possession, custody, or control of CGMC. Each
and every A Series machine manufactured by
CGMC is no longer in its control, and CGMC
cannot inspect and compare the Qingdao machine
to each and every A Series Machine.  CGMC,
therefore, denies this request.

***2/26 Response:*** Admitted.

**RFA 5.**          Admit that during Plaintiff's examination of
the Qingdao Machine, Plaintiff noted that the
cover of the Qingdao Machine  is not the exact
size as the cover of any of the A Series
Machines.

***2/11 Response:*** Plaintiff objects to Request No. 5 on the
grounds that is vague, ambiguous, overly
broad, and unduly burdensome because each and
every A Series Machine is manufactured to the
client's specifications.  Plaintiff further
objects to Request No. 5 to the extent it
requests information not presently within the
possession, custody, or control of CGMC. Each
and every A Series machine manufactured by
CGMC is no longer in its control, and CGMC
cannot inspect and compare the Qingdao machine
to each and every A Series Machine.  CGMC,
therefore, denies this request.

***2/26 Response:*** Admitted.

-20-

**RFA 6.**              Admit that during Plaintiff's examination of the Qingdao Machine, Plaintiff noted that the cover of the Qingdao Machine did not correspond with either the dimensions or size specified in the technical drawings for the A Series Machines.

*2/11 Response:* Plaintiff objects to Request No. 6 on the grounds that is vague, ambiguous, overly broad, and unduly burdensome because each and every A Series Machine is manufactured to the client's specifications. The request also does not specify which set of technical drawings Defendants want to compare the Qindgao Machine to. CGMC, therefore, denies this request.

*2/26 Response:* Admitted.

Giantway contends that CGMC erred by not withdrawing its reverse palming off claims immediately and by not mentioning the differences in sizes in the initial report that it prepared for the court. In addition, Giantway contends that CGMC erred by not giving truthful answers to the RFAs until after Giantway moved to compel the production of the specifications for the A series machines that would have demonstrated that the original answers were wrong. Finally, Giantway contends that Scott Grissom again intentionally falsified his testimony during his deposition by claiming that the cabinets and frames on the parties' machines were identical when he knew that they were not identical, per the amended the RFAs. The pertinent portion of Mr. Grissom's testimony is as follows:

Q:  So you had the photographs.  Other than the
    photographs, was any data noted prior to
    the report recorded anywhere.

A:  Repeat the question, please.

Q:  Okay.  You took measurements.  Did you
    write them down?

A:  No.

Q:  Did you make a record of them on a
    database?

A:  No.

Q:  Just retained them in your memory?

A   No.

Q:  What happened to them?

A:  We didn't feel it was relevant.

Q.  The Qingdao machine is a different size
    than you're a-Series Machine, isn't it?

A:  No.

Q:  The cabinets are identical size?

A:  Yes.

Q:  Identical?

A:  Yes.

Q.  Height?

A:  Same.

Q.  Width?

A:  Same.

-22-

Q:    Depth?

A:    Same.

Q:    Identical, that's your testimony?

A:    Yes.

Q:    What else did you measure other than the cabinet?

A:    The frame.

Q:    The frame's identical?

    Mr. Ichter:    In terms of their dimension?

    Mr. Wheat:    Whatever he's testifying that they checked.

    Mr. Ichter:    Okay. Well, you just asked him about a measurement and then you asked him if they were identical.

By Mr. Wheat:

Q:    Both. Were they identical in size?

A:    Which part?

Q:    Which part are we talking about?

A:    I don't know.

Q:    The frame.

A:    Okay. Yes.

Q:    Identical shape?

A:    Yes.

Grissom Dep. at pp. 16-17 [Doc. No. 136].

-23-

Giantway contends that there is no need to speculate about what Mr. Grissom meant when he said "identical" because he clarified it in his testimony:

> Q:   Okay.  Let's make sure that we're using the term the same way.  By identical I mean exact 100 percent correspondence.  Not essentially the same, not similar, 100 percent exact correspondence, is that what you mean by identical?
>
> A:   Yes.

Grissom Dep. at p. 19:3-8 [Doc. No. 136].

In their joint response, CGMC and CL contend that they did not act in bad faith by not moving to withdraw their reverse palming off claims until December 30, 2008.  They first argue that the differences in dimensions and components between the machines is irrelevant to the source of origin of the machine because each A series sander is built to different customer specifications.  Thus, they contend that when CGMC performed its first analysis of the machines for the report, it ignored their size and dimensions because they appeared identical, and beyond that, because size is irrelevant.  Nonetheless, CGMC and CL contend that Mr. Grissom's deposition testimony that the dimensions of the Giantway machine and the A series machine were identical was true because the size and dimensions were "essentially equal" and sufficiently "similar," both dictionary definitions of identical.  In fact, the plaintiffs

-24-

contend that CGMC's Chief Financial Officer could not even distinguish an A series machine from the Giantway machine.

CGMC and CL argue that when CGMC's initial analysis proved inconclusive, CGMC engaged an expert, Jon M. Crate of FAI Materials Testing Laboratory, to perform an independent analysis. They claim that the results they received on December 16, 2008, from this second analysis revealed de minimis differences in the dimensions of the machines. They claim that this analysis occurred two months after CGMC's Rule 30(b)(6) deposition and two weeks after Giantway filed the discovery motions that resulted in the March 24, 2009, order sanctioning CGMC. They claim that the differences between the machines revealed during this analysis were of no concern because, given the way the machines were built, CGMC would not expect them to be exactly the same. They claim that they withdrew their reverse palming off and related claims after they received Mr. Crate's analysis because other findings by Mr. Crate suggested that the IWF machine, while an impeccably close copy of a Series A machine, might not have been manufactured by CGMC.

CGMC and CL argue that Grissom did not perjure himself. As noted above, they first argue that Grissom's testimony was true. In support of this argument, they contend that the differences in size of the machines are measured in millimeters or fractions thereof and all fall within standard variations of A series

-25-

machines.   They  argue  that - to  the  naked  eye - the  machines
appeared to be identical.   Thus, they argue that Grissom's response
was accurate.   They argue that Grissom is neither an expert witness
nor a professional witness.   They argue that while he may have
answered questions more accurately, to truly determine whether the
Giantway  machine  precisely  matched  the  measurements  of  each  and
every A series machine, CGMC would have had to approach every
customer and  measure each of  the thousands of  machines  it  has
manufactured.   Finally, they contend that Grissom's deposition
notice did not specify that he should be familiar with the exact
dimensions  or  specifications  of  the  machines  at  issue,  and
Giantway's counsel did not present him with any documents regarding
the dimensions of the machines.

     Next, the plaintiffs contend  that  CGMC's discovery responses
and conduct have been truthful and accurate.   The plaintiffs argue
that CGMC initially denied Giantway's RFAs because they required a
detailed comparison of the cover of Giantway's machine to the cover
of  every A  series machine  ever manufactured.   They argue  that
CGMC's  refusal  to  do  so  did  not  demonstrate  bad  faith.   The
plaintiffs claim they altered their responses after the parties had
a "meet and confer" conference because they did not want to provoke
Giantway to file another motion to compel.   The plaintiffs also
contend that it was prohibitively expensive to produce engineering

-26-

drawings and specifications; nonetheless, they contend that they did so after the "meet and confer conference". Thus, they argue that Giantway's allegation that CGMC withheld drawings is simply untrue.

At the hearing on this matter held on August 24, 2009, the plaintiffs supplemented the arguments in their response brief with new arguments. Although the court will not recite each and every argument here, it will highlight some of the more notable contentions. First, the plaintiffs contended that Grissom did not perjure himself when discussing the size of the machines at his deposition. The plaintiffs argued that, at his deposition, Grissom was referring to the size and dimensions of the machines' cabinets as opposed to the covers, which were addressed by the RFAs. Moreover, the plaintiffs contended that Mr. Wheat, counsel for Giantway, knew that Grissom was not referring to covers when he asked Grissom to compare the respective sizes of the machines because Wheat asked Grissom about depth and Wheat was aware that a cover does not have depth. August 24, 2009 Transcript at 43 [Doc. No. 148]. The plaintiffs then pointed to the dimensional analysis performed by Jon Crate and used it to argue that the cabinet of the IWF machine was almost identical in dimension to CGMC's machine in many respects. Furthermore, the plaintiffs claim that the IWF machine is more similar to the technical drawing of CGMC's machine

-27-

than CGMC's actual machine in some other respects.  They contend that "when Mr. Grissom, who eye-balled the machine and took some measurements, but did not indicate that he measured anything like this," said that the machines were identical, he did not perjure himself.  Id. at 46:2-7.  The plaintiffs again argued that the dimensions of the machine are not material to the case; thus, they contended that misstatements by Grissom were not material facts and could not constitute perjury.

The plaintiffs next went on to explain that their decision to alter their responses to Giantway's RFA's had nothing to do with Giantway's motion to compel discovery.  Transcript at pp. 38-39 [Doc. No. 148].  Instead, they contended that it has always been their position that differences in the sizes of the parties' machines are irrelevant because each machine is manufactured to different specifications and because each handmade machine differs from the technical drawings to some respect.  Id. at 39-40.  The plaintiffs argued that they made this argument at the good faith conference, and Giantway argued that their original responses to the RFAs could not be accurate if each of the machines is different.  The plaintiffs contend that since this is a non-issue in the case at this point, they admitted the RFAs to avoid future discovery disputes.

-28-

B.   **Analysis of Motion to Dismiss**

After extensively reviewing the record, the parties' briefs, and the transcript of the hearing on this matter, it is clear to this court that CGMC has needlessly prolonged this litigation through dishonesty and bad faith.  As CGMC has pointed out, the court has previously sanctioned it for many of its wrong-doings.  However, it appears to the court, based on the new evidence and arguments before it, that such sanctions were not proportionate to CGMC's bad behavior and, were insufficient to deter CGMC from future bad acts.  Accordingly, the court must decide whether additional sanctions are appropriate to discourage this type of behavior in the future.

Federal courts have the inherent power to impose sanctions on parties, lawyers, or both.  Byrne v. Nezhat, 261 F.3d 1075, 1121 (11th Cir. 2001).  "This power is derived from the court's need 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'"  Byrne, 261 F.3d at 1106 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (alteration in original)).  According to the Eleventh Circuit, "'[t]he key to unlocking a court's inherent power is a finding of bad faith.'"  Eagle Hospital Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1306 (11th Cir. 2009) (quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998)).

-29-

This court will revisit the proceedings in this case to determine whether CGMC or its counsel has acted in bad faith. As discussed above, this case was filed as a reverse palming off action in the Fulton Superior Court on August 21, 2008. CGMC misrepresented the Georgia seizure statute in that filing, omitting critical words that would have made the seizure unlawful. Although CGMC contends that the omission of the critical terms was a mistake made in its race to the courthouse, CGMC did not rectify this mistake in its first amended complaint filed with this court or when this court had a hearing on whether CGMC should post a bond in relation to its seizure of the machine. As a result of CGMC's initial and continued misrepresentations to both the Fulton County Superior Court and this court, it was allowed to seize Giantway's machine and retain it for months to "examine the [m]achine for the purpose of determining whether the [m]achine, or portions thereof, were made by [CGMC]." Fulton County Superior Court August 22 Order at 2.

The fact that CGMC had possession of Giantway's machine obviously gave it a significant tactical advantage in this litigation. From a business perspective, it deprived Giantway, one of CGMC's competitors, from the use of its machine for months. From a litigation perspective, it gave CGMC alone the ability to examine and compare the parties' machines. Additionally, CGMC,

-30-

despite a direct order of this court to do so, delayed in posting a bond for more than four months. Thus, not only did CGMC wrongfully seize the machine and retain it for months, it did so without any security for the defendant or any risk to itself by avoiding the obligation to post the bond.

The Fulton County Superior Court ordered CGMC to report to the court its findings concerning the source and origin of the machine within a month of the seizure. The Fulton County Superior Court did not give CGMC detailed instructions as to how to conduct their examination of the machine, leaving CGMC to be guided by its discretion and generally applicable principles of good faith. On September 23, 2008, CGMC filed its report in this court. In the report, CGMC basically stated that they did not know who manufactured the IWF machine. However, it did not drop its reverse palming off claims at that juncture, instead preferring to file a motion to amend, retaining those claims and adding a claim for trade dress infringement. Thereafter, Giantway began to propound discovery requests to learn more about the examination of the machine, and CGMC's bad behavior began in earnest. Rather than participating in a cooperative and honest manner in discovery, CGMC made misrepresentations in interrogatory responses about the differences between the parties' machines, refused to turn over documents in a timely fashion, and produced a Rule 30(b)(6) witness

-31-

who appeared to be utterly unprepared and intent on confusing Giantway's attorney.[3] He gave multiple answers to many questions, thereby making it virtually impossible for Giantway to ask precise questions or receive precise answers at the deposition or in any discovery following the deposition.  A good example of this problem is highlighted by Mr. Ichter's arguments at the August 24, 2009, hearing regarding the differences between cabinets and covers.  As detailed briefly above, Mr. Ichter contended that CGMC's supplemental responses to the RFA's, which clarify that CGMC knew

---

[3]    The following deposition excerpt highlights Grissom's unwillingness to cooperate on even the most basic of questions:

```
Q:   Do you have an engineering degree?
A:   (No verbal comment).
Q:   You don't know?
A:   It's a difficult question to answer.
Q:   Enlighten us.  You don't know whether you have an engineering
     degree?  Did you go to college?
A:   Yes.
Q:   Did you graduate?
A:   Yes.
Q:   What was your major?
A:   Wood science and technology.
Q:   Excuse me?
A:   Wood science and technology.
Q:   So the difficulty is you don't know whether that's an
     engineering degree?
A:   It's not what you asked me.
Q:   Do you have an engineering degree?
A:   No.
Q:   Are you certified by anyone as an engineer?
A:   No.
```

Grissom Dep. at 41:10-42:4 [Doc. No. 136].

-32-

at the initial inspection that the cover of the IWF machine was different in size and dimension from the A series machines, do not demonstrate that Grissom perjured himself when he claimed in his deposition that the machines' cabinets were identical because the cabinets and covers were different parts of the machine. Below are excerpts from the deposition where Giantway's counsel attempted to gain an understanding of how CGMC referred to the different parts of the machine:

> Q:   What is – when you say frame, what are you
>      referring to?
>
> A:   The structure of the machine.
>
> Q:   There's a lot of structure in the machine.
>      What specific? I mean, there's pulleys,
>      there's rollers, there's belts, there's
>      electronics.   Which structure are you
>      referring to?
>
> A:   The structure of the machine.
>
> Q:   Everything?
>
> A:   No.
>
> Q:   Okay.  What are you referring to?
>
> A:   The pulley is not a structure.
>
> Q:   We'll use your term.   What do you mean by
>      structure?
>
> A:   The house, maybe, for a better word.  Does
>      that help?
>
> Q:   Exterior walls, interior walls?

-33-

A:    The carpet.

Q:    The carpet?

A:    The supporting structure.

Q:    The frame?

A:    The frame of the machine, that's correct.

Grissom Dep. at 17:25-18:23 [Doc. No. 136].

Q:    The pieces of the frame, were they all identical shape?

A:    Define the pieces.

Q:    Well, go through the frame parts again. What did you say the frame was?  Okay, the exterior walls, interior walls, the metal — what was your word? — supports?

A:    Supporting structure, I'm pretty sure.

Q:    Supporting structure, were they identical?

A:    No.

Q:    How were they different?

A:    I talked about the supporting structure of the machine.  You talked about supporting walls, the outside covers and all that.

Q:    What were you referring to a moment ago when you said they weren't identical?

A:    You stated pieces.  I said the supporting structure of the frame.

Q:    Okay.  Supporting structure of the frame. Was each piece identical size, shape and identical placement in the Qingdao machine as compared to you're a-Series Machine.

A:    It's difficult to answer your question.

-34-

Q:    How so?

A:    Because your question is too broad.

Q:    What's too broad about it?

A:    I don't think you understand what the frame
      of the machine is.

Q:    Break it down for me.  What do you say the
      frame consists of? Name the parts for me.

A:    Four post.

Q:    Four post?

A:    Supporting side rails.

Q:    Supporting side rails.

A:    That's it.

Id. at 19:9-20:19.

Q:    Okay.  What word do you use for the outer
      shell or cabinet of the machine? Is cabinet
      the word? I don't know.  Let's use your
      language.  Your vocabulary.

A:    Can I get another cup of coffee first?

      (A brief recess was taken)

Id. at 39:10-19

Q:    . . . What would you call the outer shell or
      cabinet of one of these machines.  Cabinet?
      I don't know?

A:    Covers.

Q:    Covers?

A:    Covers, yeah.

-35-

    Q:    So that would be the walls and the top and
          the bottom maybe, is that what you mean by
          covers?

    A:    What are you asking?

    Q:    I just —

    A:    What do we call it? We call it a lot of
          things.

    Q:    I want your word.

    A:    It depends on which part, okay?

Id. at 63:13-64:1.

     As these excerpts highlight, it was clearly CGMC's goal to
create evasive deposition testimony to confuse Giantway's counsel
and muddle the record so that it would be difficult to determine
what part of the machine Grissom was referring to at any given
time.[4]  Unfortunately, the confusing testimony referred to above
was far from an isolated instance.  Consider, for instance, the
following excerpt, in which Grissom provided multiple, completely

───────────────

     [4]    As Giantway's counsel pointed out at the hearing, Grissom
himself stated, in the final deposition excerpt cited above, that
they called the outer shell or *cabinet* of the machine a cover.  It
seems disingenuous to the court, that the plaintiffs' counsel
attempted to create a distinction between the cabinets and the
covers of the machines for the first time at the hearing on this
matter.  It seems to the court that if CGMC truly believed that the
cabinets referred to by Grissom in pages 16 and 17 of his
deposition were different from the covers referred to by Giantway
in their RFAs, it would have made this distinction in its response
brief and not reserved it until the hearing.

                              -36-

contradictory answers regarding the role CGMC's attorneys played in the drafting of the report.

>Q:   Okay.   You submitted a draft to your attorneys, they revised it?

>A:   Yes.

>Q:   What happened next with it?

>A:   They didn't revise the report.

>Q:   What did they revise?

>A:   A conclusion.

>Q:   Which conclusion did they revise?

>A:   We had no conclusion.

>Q:   So the attorneys wrote the conclusion, not you?

>A:   No.

>Q:   Well, who wrote it?

>A:   We wrote it.

>Q:   Which part did the attorneys do?

>A:   I don't know.

Grissom Dep. at 33:19-34:9 [Doc. No. 136].

CGMC used the report, discovery, and its responses to the motions to compel and motions for sanctions filed by CGMC to propound the following confusing and delay-inducing legal theory: differences between the parties' machines were "irrelevant" and did

-37-

not demonstrate that the IWF machine was not a CGMC machine.  Thus, although CGMC admittedly took time to measure the parties' machines and to compare the IWF machine to CGMC's technical drawings in its initial examination of the machine, it claims that it did not record any of the measurements.  Moreover, even though CGMC found that there were components on the IWF machine not used by CGMC, CGMC found that these differences were irrelevant and chose not to put them in the report regarding source of origin.

Despite its contentions that the differences between the machines were irrelevant, CGMC continued to retain the IWF machine and even hired an expert to compare the differences between the machines, including the differences between the sizes of the machines.  It claims that it withdrew its reverse palming off and related claims after it received Mr. Crate's analysis on December 16, 2008, because other findings by Mr. Crate suggested that the IWF machine might not have been manufactured by CGMC.  Incredibly, even though CGMC realized from information available on December 16 that its reverse palming off claims were not viable, it did not simply amend its complaint to remove those claims - instead preferring to send litigious letters to Giantway offering to remove those claims in exchange for some action on Giantway's behalf.  [Doc. No. 44, Ex. 12].  Apparently, those "negotiations" fell through, and on December 30, 2008, without movement by CGMC,

-38-

Giantway was compelled to file its motion for Rule 11 sanctions based, in part, on CGMC's failure to timely withdraw its reverse palming off claims.

The parties' discovery issues continued to escalate, resulting in CGMC's supplemental RFAs discussed above. Although each party describes the circumstances leading to the change in the RFA responses differently, one thing is clear: CGMC completely changed its RFA responses in a two week period.[5] Regardless of which response was technically accurate, the fact remains that CGMC's answers are diametrically opposed. This leads the court to believe one of two things. First, the original answer was technically correct but was interposed for the purpose of delay, or second, the original answer was incorrect and was altered upon threat of additional discovery motions. Either scenario indicates bad faith.

On March 24, 2009, this court entered the discovery order sanctioning CGMC and its counsel of record [Doc. No. 80]. Thereafter, in an effort to somehow rectify the situation, CGMC filed a motion for reconsideration [Doc. No. 86]. Attached to the motion for reconsideration was the affidavit of Scott Grissom in which he claimed, for the first time, that he extensively prepared for the Rule 30(b)(6) deposition. Because this testimony

---

[5]    Importantly, CGMC does not contend that it further researched the issues inherent in the RFAs in this time period.

completely contradicts his deposition testimony, it is still unclear to the court whether he adequately prepared for the deposition and intentionally falsified his deposition testimony about his preparation, or whether he did not prepare for the deposition and was untruthful to the court in affidavit form to somehow protect his counsel's interests. Either way, it is clear that Grissom testified dishonestly.

After CGMC filed Grissom's affidavit, thereby alerting Giantway to new inconsistencies in the record, Giantway filed the instant motion to dismiss and the court held a hearing on the same. Although CGMC contends that this motion to dismiss does not bring up any new evidence or grounds for this court to enter additional sanctions, the court disagrees. The motion to dismiss and CGMC and CL's arguments in response thereto demonstrate clearly how, at almost every stage in this litigation, CGMC and its counsel have engaged in deceptive behavior. In fact, the behavior has been so egregious and the deception so rampant that it is impossible for this court to determine now whether CGMC had any basis for the reverse palming off claim after it examined the machine, whether the report was conducted in good faith, and whether this case proceeded on anything other than pretense for the first several months of this case.

-40-

The court finds that CGMC and its counsel have acted willfully in bad faith, vexatiously, wantonly, and for oppressive reasons. The misconduct was not that of counsel alone nor CGMC's agent alone. The acts of misconduct were not isolated and were part of an intentional course of misconduct in which both the president for CGMC and its counsel participated in concert with each other. Intentional misrepresentations were made to this court and the Superior Court of Fulton County, Georgia. This litigation has been delayed and disrupted by the actions of CGMC and its counsel. The actions discussed above have caused unnecessary delay, needless increase in the costs of litigation, and harassment of the defendant and its attorneys. For such conduct to go uncorrected would result in no meaning to the oath of a witness, no meaning to the conduct among attorneys, and no rule of law. Eagle Hospital Physicians, LLC v. SRG Consulting, Inc., et al., Case No. 1:04-cv-1015-JOF, 2007 WL 249290, at *10-11 (N.D. Ga. Aug. 28, 2007) (citing Lipin v. Bender, 84 N.Y.2d 562 (N.Y. 1994)), aff'd, 561 F.3d 1298 (11th Cir. 2009).

In light of the pervasive nature of the bad faith and dishonesty in this case, this court concludes that significant sanctions are warranted. The "[d]ismissal of a party's complaint or answer, or striking its defenses, as a sanction ... is a heavy punishment," appropriate "only as a last resort, when less drastic

-41-

sanctions would not ensure compliance with the court's orders." <u>In re Sunshine Jr. Stores</u>, 456 F.3d 1296, 1305-06 (11th Cir. 2006). Although dismissal of CGMC's complaint would be appropriate, the court acknowledges that CL was only added as a plaintiff after the majority of the infractions discussed herein occurred. Moreover, the court acknowledges that the plaintiffs' former counsel of record has withdrawn and that the plaintiffs may indeed have a valid trade dress infringement claim against the defendants. Therefore, the court will consider lesser sanctions and will not dismiss the complaint.

Because of the bad faith and egregious conduct exercised by CGMC and its counsel, the court will exercise its inherent powers to grant an award of attorney's fees and costs to Giantway for all expenses incurred to date, with the exception of the filing of the second amended complaint and any actions taken in relation thereto since the filing. These fees should include all reasonable costs and expenses incurred by Giantway as a result of the wrongful seizure of its machine. Moreover, these costs and fees should certainly include those expenses incurred in relation to the pending motion to dismiss and motion for partial summary judgment.

The court grants such an award pursuant to its inherent power "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Chambers</u>, 501 U.S. at 43

-42-

(citing <u>Link v. Wabash Railroad Co.</u>, 370 U.S. 626, 630-31 (1962)).
The court recognizes that these powers "must be exercised with
restraint and discretion." <u>Id.</u> at 45.  Accordingly, in this case,
the court has chosen not to dismiss the plaintiffs' claims entirely
but rather to impose a less drastic sanction: attorneys' fees.  <u>See</u>
<u>id.</u> (noting that the assessment of attorneys' fees is a less severe
sanction than the outright dismissal of an action).  In this case,
CGMC has clearly acted in bad faith; accordingly, such an award is
appropriate.  <u>Id.</u> at 45-46 ("[A] court may assess attorney's fees
when a party has 'acted in bad faith, vexatiously, wantonly, or for
oppressive reasons.") (citations and internal punctuation omitted).

The court is aware that it has previously ruled that sanctions
are warranted against CGMC's counsel in the form of attorneys' fees
incurred by Giantway in filing its initial motion for Rule 11
sanctions.  The court has not yet established a dollar amount for
those sanctions.  The court does not intend this order to allow a
second recovery of the same fees.  Accordingly, in determining the
total amount of sanctions to be imposed pursuant to this order, the
court will subtract the amount determined to be attributable to the
conduct addressed in the March 24, 2009 order.  All fees assessed
pursuant to this order shall be payable jointly and severally by
CGMC and its attorneys.

**III.    <u>Motion for Summary Judgment [Doc. No. 96]</u>**

-43-

Giantway seeks summary judgment as to its counterclaim alleging wrongful seizure of its machine.  In this motion, Giantway seeks attorneys' fees for almost everything it has done in this case.

Damages are available under O.C.G.A. § 10-1-451(e) from "[any person who caused] seizure of goods which are not counterfeits . . . ."  The damages available include:

(A) Any damages proximately caused to any person having a financial interest in the seized goods by the seizure of goods which are not counterfeit;

(B) Costs incurred in defending against seizure of noncounterfeit goods; and

(C) Upon a showing that the person causing seizure to occur acted in bad faith, expenses, including reasonable attorneys' fees expended in defending against the seizure of any noncounterfeit or noninfringing goods.

O.C.G.A. § 10-1-451(e).

This court has already determined that CGMC acted in bad faith in seizing the defendant's machine.  Accordingly, the defendant is entitled to summary judgment on its counterclaim alleging unlawful seizure.  Importantly, the court has already determined that sanctions against CGMC and its attorneys are warranted for the unlawful seizure of the machine as well as numerous examples of egregious misconduct detailed above.  These sanctions will include reimbursement of all reasonable attorneys' fees and costs incurred by the defendant from the inception of this lawsuit to date, with

-44-

the exception of the filing of the second amended complaint and any actions taken in relation thereto since the filing. The court will not award a double recovery of the costs and expenses to the defendant. As such, the motion for partial summary judgment [Doc. No. 96] is GRANTED, and judgment will be entered for the defendant on the wrongful seizure counterclaim. However, damages will not be awarded on this claim because the defendants are receiving all costs and expenses as sanctions based on the motion to dismiss.

## IV. Determination of Reasonable Fees and Expenses

Currently pending before this court is the issue of the amount of reasonable attorneys' fees and costs incurred by Giantway from the date of the inception of this lawsuit through the filing of the second amended complaint plus the filing of the motion to dismiss [Doc. No. 95] and the motion for partial summary judgment [Doc. No. 96] and all related briefs and documents.

(1) This court finds that appointment of a Special Master is appropriate in order to expediently address this issue. The Clerk of Court is DIRECTED to assign this case to Magistrate Judge Walter Johnson to serve as Special Master for the purpose of determining and issuing a report and recommendation on the amount of reasonable attorneys' fees that will be issued as sanctions pursuant to this

-45-

court's March 24, 2009, order and the instant order.[6] The court
notes that the sole issue before the Special Master is amount of
reasonable attorney fees and costs.   This court has already
determined that  sanctions will be imposed against the plaintiffs
and their attorneys of record during the period of time between the
inception of this lawsuit and the filing of the second amended
complaint on March 30, 2009, plus the costs and expenses of filing
the motion to dismiss [Doc. No. 95] and the motion for partial
summary judgment [Doc. No. 96].   The parties are limited in their
arguments before the Special Master to the issue of reasonable
attorney fees and costs incurred by the defendants during this
designated period of time.

(2) As Special Master with regard to amount of reasonable
costs and attorney fees, Magistrate Judge Johnson shall have the
rights, powers, and duties provided in F.R.C.P. 53, or with this or
other orders of the court.   The Special Master may consider the
declarations and reply briefings [Doc. Nos. 85, 98, 119, 120, and
143] and opposition briefings [Doc. Nos. 90, 125, and 150-2] filed

---

[6]   The court again notes that there is overlap between the
costs and fees associated with the March 24, 2009, order and costs
and fees associated with the instant order.   The final award of
fees and costs will not allow for a double recovery.   The Special
Master is DIRECTED within the Report and Recommendation to
delineate the amount of reasonable costs and fees that are
duplicated so as this court may issue a judgment in the proper
amount.

-46-

by the parties related to the March 24, 2009 order granting sanctions. The Special Master may also consider the declarations [Doc. No.122, 123, 143, and 144] and responsive briefing [Doc. No. 108] related to the defendants' motion for partial summary judgment and motion to dismiss. It is fully within the Special Master's discretion to direct additional briefing on these issues or to conduct a hearing. Furthermore, the Special Master may by order impose upon a party any sanction other than contempt and may recommend a contempt sanction against a party and contempt or any other sanction against a non-party.

(3) With the exception of scheduling and administrative matters, the parties shall not engage in any ex parte discussions with the Special Master, and the Special Master shall not engage in any ex parte discussions with any of the parties.

(4) The parties shall file with the Clerk all papers filed for consideration by the Special Master. The Special Master shall also file with the Clerk all reports or other communications with the undersigned.

(5) Any party seeking review of any ruling of the Special Master shall comply with the procedures and within the time limits specified in Federal Rule of Civil Procedure 53(f).

**V. Conclusion**

-47-

(1) Giantway's motion to dismiss and motion for sanctions [Doc. No. 95] is DENIED in part and GRANTED in part. To the extent that Giantway seeks dismissal of this action, the motion is DENIED; to the extent that Giantway seeks sanctions against CGMC and its counsel, the motion is GRANTED. The court finds that Giantway is entitled to recovery of all reasonable costs and fees incurred from the inception of this lawsuit until the filing of the second amended complaint on March 30, 2009, plus the expenses of filing the motion to dismiss [Doc. No. 95] and motion for partial summary judgment [Doc. No. 96].

(2) Giantway's motion for partial summary judgment [Doc. No. 96] is GRANTED. At the conclusion of this case, judgment will be issued in favor of Giantway as to its counterclaim alleging unlawful seizure of its machine. Because Giantway is receiving all its reasonable costs and fees incurred as a result of the wrongful seizure, no damages will be awarded.

(3) The motion for leave to file a surreply [Doc. No. 150] filed by CGCM's former counsel, the law firm of Adorno & Yoss, is GRANTED. The surreply shall be considered in determining the amount of the sanction award pursuant to this court's March 24, 2009 order.

(4) The plaintiffs and their former and current attorneys' consent motion permitting Adorno & Yoss to withdraw and have its

-48-

name stricken from the court's records as attorney of record in this action [Doc. No. 147] is DENIED.  The court notes that this denial does not affect the withdrawal of the plaintiffs' former counsel.  An order of the court is unnecessary for parties to obtain and substitute counsel.  See L.R. 83.1E

(5) The Clerk is DIRECTED to assign this case to Magistrate Judge Johnson to act as Special Master with regard to determining the amount of reasonable costs and attorney fees incurred by the defendants.

SO ORDERED, this 2nd day of December, 2009.


/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge

-49-